[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11719

_____

D.C. Docket No. 1:18-cv-04570-WMR


JOY LASKAR, PH.D.,

Plaintiff-Appellant,

versus

PHILLIP W. HURD,
PATRICK A. JENKINS,
JILDA D. GARTON,
MARK G. ALLEN.

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 28, 2020)

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, Circuit Judge, and
MOORE,* Chief District Judge.

_____

* Honorable K. Michael Moore, Chief United States District Judge for the Southern
District of Florida, sitting by designation.

WILLIAM PRYOR, Chief Judge:

The main issue in this appeal is whether the dismissal of a prosecution as untimely satisfies the favorable-termination element of a claim for malicious prosecution under the Fourth Amendment. Joy Laskar's complaint alleges that Jilda Garton, Mark Allen, Patrick Jenkins, and Phillip Hurd—four officials at the Georgia Institute of Technology—played a role in creating a report that falsely accused him of stealing resources from the Institute, which then led to his arrest and prosecution for racketeering and theft. After a state trial judge dismissed the prosecution as untimely, Laskar sued the officials in the district court for malicious prosecution under the Fourth Amendment. The officials moved to dismiss the complaint and invoked qualified immunity. The district court concluded that the dismissal of Laskar's prosecution was not a favorable termination and granted the motion. We disagree and conclude that a dismissal for untimeliness qualifies as a favorable termination. We also conclude that Laskar has alleged that Hurd and Jenkins, but not Garton and Allen, violated his clearly established constitutional rights. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

Laskar was an electrical engineer and professor at Georgia Tech who served as the director of the Georgia Electronic Design Center, a research entity affiliated with Georgia Tech. The Center established partnerships with technology

companies that provided funding to the Center in exchange for collaborating with researchers from Georgia Tech. Laskar founded and directed one such company, Sayana Wireless LLC, which became a paying member of the Center, entitled to use the facilities, equipment, and staff of Georgia Tech.

In December 2009, Garton, the Associate Vice Provost for Research, and Allen, the Senior Vice Provost for Research and Innovation, requested that the auditing department at Georgia Tech investigate around $650,000 in cost overruns at the Center. Over the next two months, Garton and Allen expressed their concerns to Hurd, the Chief Audit Executive, that Laskar was mixing his work at Georgia Tech with his work for Sayana and that money at the Center was being "double spent." Hurd, who led the investigation, expanded the audit to all of the Center's finances.

In April 2010, Hurd and his audit team, which included Jenkins, produced a report that accused Laskar of lying to the Internal Revenue Service, misusing equipment and other property of Georgia Tech to benefit Sayana, and committing other violations of Georgia law. Hurd later reported that the amount of theft "may be as great as $700,000 to $1,470,000."

Hurd gave the report to the Associate Vice Chancellor of Georgia Tech, who notified the Attorney General of Georgia. The Georgia Bureau of Investigation began to investigate Laskar. In May 2010, a special agent from the Bureau

3

submitted an affidavit to two state judges to secure warrants for the search and seizure of Laskar and his property. The affidavit explained that the "primary source of information" supporting the request was the audit. It also clarified that "[u]nless otherwise indicated," Hurd provided the information supporting the affidavit.

The warrant affidavit reiterated that "Laskar had used his position at Georgia Tech to steal money and other resources from the Institute." It stated that Laskar used funds from Georgia Tech to pay for fully functional microchips that Sayana then sold. It also asserted that Laskar abused his position at Georgia Tech to give Sayana illegal access to the school's equipment, employees, and other resources.

The accusations in the warrant affidavit were false. After an investigation, the Internal Revenue Service determined that Sayana and Laskar owed no tax penalties. Sayana was entitled to use the equipment and resources of Georgia Tech at the Center. And the only microchips that Sayana used were chip prototypes it provided to students and faculty at Georgia Tech for research purposes. Sayana never sold these chips, which had no market value; instead, it had a collaborative research agreement with an outside company to test and evaluate the microchip prototypes.

The investigation that Hurd and his audit team conducted, which provided the basis for the affidavit, was less than thorough. For example, Hurd and Jenkins did not investigate whether Laskar or Sayana had sold the microchips. Nor did they

4

have any evidence that Laskar had ever taken or used these microchips. And although Hurd ostensibly expanded the audit to all of the Center's finances, the investigation focused exclusively on Sayana's relationship with the Center. Had Hurd and Jenkins examined the Center more broadly, they would have found that Sayana, like numerous other companies, gained access to the Center's resources in exchange for paying a membership fee.

Both judges issued the warrants after concluding that probable cause existed to find that Laskar had violated Georgia law. State law-enforcement officers and officials from Georgia Tech executed the warrants the next week. They raided 21 locations, including Laskar's home, office, and vehicle. They seized many of Laskar's personal items, including his computers. Laskar was also arrested and "deprived of his personal liberty."

The accusations against Laskar led to a failed prosecution against him in state court. In December 2014, a grand jury indicted Laskar for racketeering and theft. The trial court dismissed the charges against Laskar nearly two years later. It ruled that any potentially criminal act by Laskar could have occurred only outside the statute of limitations.

Laskar filed a complaint of malicious prosecution under the Fourth Amendment against Hurd, Jenkins, Garton, and Allen. *See* 42 U.S.C. § 1983. The complaint alleged that these four officials "knowingly provid[ed] false, misleading

5

and materially incomplete information" about Laskar "to law enforcement and prosecutors" and that they "maliciously instigat[ed] . . . the criminal prosecution [against him] without probable cause."

The officials moved to dismiss Laskar's complaint. They argued that Laskar's claim failed because the dismissal of the prosecution against him as untimely was not a favorable termination. The officials also invoked qualified immunity and argued that Laskar had not alleged that they acted without probable cause, that they acted with malice, or that they caused his prosecution. The district court agreed with the officials that Laskar had failed to allege a favorable termination and dismissed his complaint.

## II. STANDARD OF REVIEW

We review *de novo* a dismissal for failure to state a claim. *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019). "We accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly

6

established at the time of the challenged action." *Id.* (internal quotation marks omitted). This immunity "protect[s] from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008) (internal quotation marks omitted), *abrogated on other grounds by Williams v. Aguirre*, 965 F.3d 1147, 1162–65 (11th Cir. 2020). To receive qualified immunity, the state official "bears the initial burden to prove that he acted within his discretionary authority." *Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017). Officials that act within their discretionary authority are "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). Laskar does not dispute that the officials acted within their discretionary authority, so he bears the burden of proving that they are not entitled to qualified immunity from his claim of malicious prosecution.

To state a claim of malicious prosecution, Laskar must overcome two hurdles. First, he must prove that he suffered a seizure pursuant to legal process that violated the Fourth Amendment. *See Williams*, 965 F.3d at 1157–59; *Kingsland v. City of Miami*, 382 F.3d 1220, 1235 (11th Cir. 2004). This burden requires him to "establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified

7

without legal process." *Williams*, 965 F.3d at 1165. Second, Laskar must satisfy "the elements of the common law tort of malicious prosecution." *Id.* at 1157 (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019)). Under these elements, Laskar must prove that the officials instituted criminal process against him "with malice and without probable cause" and that the broader prosecution against him terminated in his favor. *Id.* (quoting *Paez*, 915 F.3d at 1285). Although the common-law elements of malicious prosecution also require proof of damages, *see Paez*, 915 F.3d at 1285; *Wood v. Kesler*, 323 F.3d 872, 881–82 (11th Cir. 2003), we have long held that "a plaintiff may recover *nominal* damages even though he suffers no compensable injury" when he raises a claim of malicious prosecution under the Fourth Amendment. *Kelly v. Curtis*, 21 F.3d 1544, 1557 (11th Cir. 1994); *accord Williams*, 965 F.3d at 1161, 1168.

Laskar alleges that he suffered a seizure pursuant to legal process. Although the officials are correct that the search and seizure of Laskar's property cannot give rise to a claim of malicious prosecution, *see, e.g.*, *Williams*, 965 F.3d at 1164, Laskar alleges that state law enforcement obtained a warrant for his seizure. He also alleges that he was arrested and "deprived of his personal liberty." Taken together, these allegations suffice to plead a seizure pursuant to legal process.

The officials contend that Laskar failed to allege several of the common-law elements of malicious prosecution. To start, they argue that Laskar cannot satisfy

8

the favorable-termination requirement. Next, the officials argue that Laskar failed to allege that they initiated proceedings against him without probable cause and with malice. Finally, they contend that Laskar failed to allege that they caused his injury. We consider each of the officials' arguments under this standard before considering whether Laskar alleged that the officials violated his clearly established rights.

### A. Laskar Received a Favorable Termination.

The officials argue that Laskar did not receive a favorable termination. They explain that several of our sister circuits define favorable terminations as those that "indicate the innocence of the accused." *Cordova v. City of Albuquerque*, 816 F.3d 645, 651 (10th Cir. 2016) (internal quotation marks omitted); *accord Jordan v. Town of Waldoboro*, 943 F.3d 532, 545–46 (1st Cir. 2019); *Lanning v. City of Glens Falls*, 908 F.3d 19, 26 (2d Cir. 2018); *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009) (en banc) (citing *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002)); *Salley v. Myers*, No. 19-6374, 2020 WL 4664808, at *3–4 (4th Cir. Aug. 10, 2020); *Jones v. Clark Cnty.*, 959 F.3d 748, 763–64 (6th Cir. 2020); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004). *But cf. Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (holding that the favorable-termination requirement does not apply to a claim for unconstitutional pretrial detention). Laskar cannot satisfy the favorable-termination element, they contend, because the

9

trial court dismissed the prosecution against him as untimely, which does not suggest that he was innocent of the charges facing him.

This argument requires us to decide whether a termination must contain evidence of a plaintiff's innocence to be favorable. We have held that a claim of malicious prosecution accrues when the prosecution against the plaintiff terminates in his favor. *See Whiting v. Traylor*, 85 F.3d 581, 585–86 (11th Cir. 1996), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384, 389–90 (2007). We have also held that a prosecutor's unilateral dismissal of charges against a plaintiff constitutes a favorable termination. *See Uboh v. Reno*, 141 F.3d 1000, 1005–06 (11th Cir. 1998). But the details of the favorable-termination requirement, including whether a termination must suggest a plaintiff's innocence, otherwise remain unsettled.

This question implicates our "two-step approach to 'defining the contours and prerequisites of a § 1983 claim.'" *Williams*, 965 F.3d at 1159 (quoting *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017)). We must first look to the common-law principles that were "well settled" when Congress enacted section 1983. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019) (internal quotation marks omitted); *accord Manuel*, 137 S. Ct. at 920. "After identifying the relevant common-law rule, we must consider whether that rule is compatible with the constitutional provision at issue." *Williams*, 965 F.3d 1159–60.

10

Because the tort of malicious prosecution is the common-law analogue to the constitutional violation that Laskar alleges, *see id.*, we examine the favorable-termination element of malicious prosecution as it existed when Congress enacted section 1983 in 1871. We then consider whether the relevant common-law rule is compatible with the Fourth Amendment.

At common law, the favorable-termination requirement ensured that plaintiffs could not "recover in the [civil] action, and yet be afterwards convicted on the original prosecution." Fisher v. Bristow (1779) 99 Eng. Rep. 140, 140; 1 Dougl. 215, 215. Although the predecessor to malicious prosecution, the writ of conspiracy, required the plaintiff to prove that a petit jury had acquitted him, *see* Edward Coke, *The Third Part of the Institutes of the Laws of England* 143 (6th ed. 1680); Hurlestone v. Glaseour (1587) 75 Eng. Rep. 988, 988; Gould. 51, 51 (Star Chamber), English courts relaxed this requirement for the common-law tort of malicious prosecution. For example, they held that the favorable-termination element did not apply when the relevant proceedings against the plaintiff were *ex parte* because the plaintiff had no opportunity to secure a favorable termination. *See* Steward v. Gromett (1859) 141 Eng. Rep. 788, 793–95; 7 Com. B.R. 191, 203–07. Additionally, the meaning of "favorable termination" encompassed more than jury acquittals. *See* 3 William Blackstone, *Commentaries* *127 ("[A]n action for a malicious prosecution may be founded on such an indictment whereon no

11

acquittal can be; as if it be rejected by the grand jury, or be *coram non judice*, or be insufficiently drawn."); *see also, e.g.*, Chambers v. Robinson (1725) 93 Eng. Rep. 787, 787; 2 Strange 691, 691–92. Indeed, plaintiffs could satisfy the requirement with terminations that did not support their innocence. Dowell v. Beningfield (1841) 174 Eng. Rep. 384, 384–85, 388; Carr. & Marsh. 8, 8–9, 15 (conviction by a court that lacked jurisdiction); Pierce v. Street (1832) 110 Eng. Rep. 142, 143; 3 B. & Ad. 397, 399 (dismissal for want of prosecution).

American courts likewise used the favorable-termination requirement to prevent plaintiffs from attacking criminal proceedings that either were ongoing or had vindicated the defendant's accusations. *See* Martin L. Newell, *A Treatise on the Law of Malicious Prosecution, False Imprisonment, and the Abuse of Legal Process* 331 (Chi., Callaghan & Co. 1892). Accordingly, plaintiffs could not prevail when the prosecutions against them remained pending, *see, e.g.*, *Bacon v. Waters*, 84 Mass. (2 Allen) 400, 401–02 (1861); *Bacon v. Townsend*, 6 Barb. 426, 428–29 (N.Y. Gen. Term 1849), juries convicted them, *see, e.g.*, *Griffis v. Sellars*, 20 N.C. (3 & 4 Dev. & Bat.) 315, 315 (1838), or they compromised with their accusers and admitted guilt to end the prosecution, *see, e.g.*, *Clark v. Everett*, 2 Grant 416, 417 (Pa. 1853). But like their English counterparts, American plaintiffs could prevail without a favorable termination when the relevant proceedings against them were *ex parte*. *See, e.g.*, *Swensgaard v. Davis*, 23 N.W. 543, 543

12

(Minn. 1885); *see also Fortman v. Rottier*, 8 Ohio St. 548, 552–53 (1858) (applying this rule in the context of a civil prosecution).

The clear majority of American courts did not limit favorable terminations to those that suggested the accused's innocence. Only the Supreme Court of Rhode Island held that the favorable-termination requirement turned on evidence of a plaintiff's innocence. *Rounds v. Humes*, 7 R.I. 535, 537 (1863) (requiring, "with reluctance," that the termination "furnish *prima facie* evidence that the action was without foundation") (quoting Wilkinson v. Howel (1830) 173 Eng. Rep. 1236, 1236; 1 M. & M. 495, 496 (dicta)). Elsewhere, plaintiffs could prevail even when the termination of the prosecutions against them did not bear on the merits, including when a court dismissed the prosecution after the accuser failed to appear, *see, e.g.*, *Fay v. O'Neill*, 36 N.Y. 11, 13 (1867), failed to file an indictment, *see, e.g.*, *Murray v. Lackey*, 6 N.C. (2 Mur.) 368, 368–69 (1818), or abandoned the prosecution, *see, e.g.*, *Driggs v. Burton*, 44 Vt. 124, 143–44 (1871); *Brown v. Randall*, 36 Conn. 56, 61–63 (1869); *Page v. Cushing*, 38 Me. 523, 527 (1854); *Chapman v. Woods*, 6 Blackf. 504, 505–06 (Ind. 1843); *Sayles v. Briggs*, 45 Mass. (4 Met.) 421, 425–26 (1842); *Yocum v. Polly*, 40 Ky. (1 B. Mon.) 358, 359 (1841); *Burhans v. Sanford*, 19 Wend. 417, 418 (N.Y. 1838); *Cotton v. Wilson*, Minor 203, 203 (Ala. 1824).

Many States also defined the favorable-termination element without regard to a plaintiff's innocence. For example, the Indiana Supreme Court held that the dismissal of a prosecution at an accuser's request was a favorable termination even though "the want of probable cause [was] not spread upon the record." *Chapman*, 6 Blackf. at 505. The only requirement, the court reasoned, was that "the original prosecution, wherever instituted, is at an end." *Id.* at 506. New York's highest court agreed and concluded that "the technical prerequisite" of a favorable termination "is only that the particular prosecution be disposed of in such a manner that [it] cannot be revived, and the prosecutor must be put to a new one." *Clark v. Cleveland*, 6 Hill 344, 347 (N.Y. 1844); *see also Fay*, 36 N.Y. at 13. And when one accuser contended that the underlying prosecution must end with a judicial finding that probable cause did not exist, the Iowa Supreme Court held that "nothing" about the favorable-termination element required the court in the underlying prosecution to find "any precise matter in a certain form." *Paukett v. Livermore*, 5 Iowa 277, 282 (1857). Other courts of last resort endorsed similar standards. *See Thomas v. De Graffenreid*, 11 S.C.L. (2 Nott & McC.) 143, 145 (1819) ("[A] person may have his action after a bill rejected by the grand jury, or even where no bill has been preferred, if there is a final end of the prosecution and the party discharged."); *Murray*, 6 N.C. at 369 (holding that a plaintiff could proceed when he established that "proceedings are at end and cannot be revived").

14

The number of States that defined the favorable-termination requirement in a similar manner grew in the years soon after Congress enacted section 1983. Decrying the "great injustice" of "refus[ing] a remedy for such a wanton injury . . . on a ground which is purely technical," the Michigan Supreme Court held that an action for malicious prosecution could continue "whenever the particular proceeding has come to an end, so that the prisoner can be no further pursued upon it." *Stanton v. Hart*, 27 Mich. 539, 540 (1873). The Supreme Court of New Jersey held that "[e]xcept to confer on the accused the capacity to sue, the manner in which the prosecution terminated is irrelevant." *Apgar v. Woolston*, 43 N.J.L. 57, 59 (1881). The Supreme Courts of New Hampshire and Kansas agreed. *See Woodman v. Prescott*, 22 A. 456, 456–57 (N.H. 1891) ("The law requires only that the particular prosecution complained of shall have been terminated, and not that the liability of the plaintiff to prosecution for the same offense shall have been extinguished . . . ."); *Marbourg v. Smith*, 11 Kan. 554, 562 (1873) ("[I]t is not necessary that there should have been a trial upon the merits of the alleged malicious prosecution. If the action has been dismissed . . . that is sufficient, if the action has not been commenced again."); *see also Kennedy v. Holladay*, 25 Mo. App. 503, 517 (1887) ("The essential thing is, that the prosecution, on which the civil action is predicated, should have come to an end. How it came to an end can

15

make no difference to the rights of the person injured thereby."). The Supreme

Court of Nebraska captured the dominant view of its sister States:

> [T]he weight of authority, as well as of reason, is in favor of the position that the right of action is complete whenever the particular prosecution be disposed of in such a manner that [it] cannot be revived, and the prosecutor, if he proceeds further, will be put to a new one.

*Casebeer v. Drahoble*, 14 N.W. 397, 397 (Neb. 1882) (internal quotation marks

omitted). Even Hawai'i, which was then an independent kingdom and not a state or

even a territory, followed the same rule, despite the dissent's suggestion to the

contrary. *McCrosson v. Cummings*, 5 Haw. 391, 392 (1885) ("The action for

malicious prosecution lies whenever the proceeding has come to an end, whatever

may be the form of its termination." (internal quotation marks omitted)).

To be sure, States did not adopt "perfectly reconcilable" approaches to the

favorable-termination requirement, *see* 1 Francis Hilliard, *The Law of Torts or

Private Wrongs* 475 (Bos., Little, Brown & Co. 4th ed. 1874), but their disputes

reflected concerns of finality, not whether evidence of innocence existed. For

example, courts split over whether a plaintiff received a favorable termination

when a grand jury returned a no bill but the trial court did not dismiss the

indictment. Some courts refused to allow the plaintiff to proceed because the

plaintiff did not receive "a legal discharge" and "a subsequent grand jury might

. . . find a bill upon the same complaint." *Knott v. Sargent*, 125 Mass. 95, 98

(1878); *accord, e.g.*, *Thomas*, 11 S.C.L. at 146. Other courts held that the plaintiff

16

received a favorable termination when the prosecution had functionally ended even though a grand jury might still issue an indictment on the same complaint. *See, e.g.*, *Woodruff v. Woodruff*, 22 Ga. 237, 245 (1857). These competing conceptions of an "end" to prosecution created similar splits over whether a *nolle prosequi*—a prosecutor's record notice that he was ending the prosecution—was a favorable termination, *see* Thomas M. Cooley, *A Treatise on the Law of Torts* 186 & nn.6–7 (Chi., Callaghan & Co. 1880) (collecting decisions), and over whether a discharge pursuant to writ of *habeas corpus* was a favorable termination, *compare Walker v. Martin*, 43 Ill. 508, 512–13 (1867) (holding that a plaintiff who was discharged on a *habeas* writ did not receive a favorable termination because he did not prove that the prosecution itself had ended), *with Zebley v. Storey*, 12 A. 569, 571–72 (Pa. 1888) (holding that a *habeas* writ "effectually puts an end to the prosecution . . . although a new charge may be afterwards made" (internal quotation marks omitted)).

States instead channeled questions about the effect of the termination of underlying proceedings into other elements of the tort—ordinarily the probable-cause requirement. Some terminations—convictions or settlements in which the defendant admitted guilt—were fatal to a plaintiff's ability to establish the absence of probable cause. *See, e.g.*, *Griffis*, 20 N.C. at 315 (holding that a conviction creates conclusive evidence of probable cause); *Morton v. Young*, 55 Me. 24, 27

17

(1867) (holding that a plaintiff who settled a prosecution by paying part of the amount his accuser demanded was estopped from contesting the absence of probable cause). Courts also debated the evidentiary effect, if any, that other terminations had on the plaintiff's burden to prove the absence of probable cause. *See* Newell, *supra*, at 289–303; *see also* Annotation, *Acquittal, Discharge, or Discontinuance as Evidence of Want of Probable Cause in Action for Malicious Prosecution*, 24 A.L.R. 261 (1923) (collecting decisions contemporary to the enactment of section 1983). For example, some states held that a decision by a grand-jury to issue an indictment was evidence of probable cause. *See* Cooley, *supra*, at 186. In addition to probable cause, the nature of a prior termination could affect whether a plaintiff established damages. *See Sears v. Hathaway*, 12 Cal. 277, 278–79 (1859) (holding that a plaintiff who secured an acquittal in the underlying suit on technical grounds but was "moral[ly] guilt[y]" of the conduct alleged could not establish reputation damages).

In the light of this history, we have no trouble discerning a well-settled principle of law to guide our analysis. Although States disputed whether a prosecution could terminate without a court order, every State to reach the issue other than Rhode Island agreed that a prosecution terminated when a court formally dismissed the prosecution and discharged the plaintiff. And the vast majority of courts to consider the favorable-termination requirement either adopted

18

standards that excluded considering the merits of the underlying prosecution or held that particular terminations that did not evidence plaintiffs' innocence could satisfy the requirement. Indeed, outside of Rhode Island, the only final terminations that would bar a plaintiff's suit were those that were inconsistent with a plaintiff's innocence—that is, if a jury convicted the plaintiff or if the plaintiff compromised with his accuser to end the prosecution in a way that conceded his guilt. So we can readily discern from that consensus the following principle: a formal end to a prosecution in a manner not inconsistent with a plaintiff's innocence is a favorable termination.

The dissent does not dispute that only Rhode Island required evidence of a plaintiff's innocence to satisfy the favorable-termination element. It instead stresses that courts did not agree on all aspects of the element and that no court expressly endorsed the consensus rule we endorse. According to the dissent, courts adopted three approaches to the favorable-termination element—"(1) those accepting any termination that discharged the plaintiff . . . (2) those requiring that the termination be such that the claimant could not be prosecuted further on the same criminal charge . . . and (3) those requiring a verdict on the merits." Dissenting Op. at 44. And this disagreement, the dissent concludes, precludes us from concluding that any well-settled consensus existed.

19

We are not persuaded. The dissent overstates the scope and nature of disagreements over the favorable-termination requirement. Although States disputed whether a formal termination to proceedings was necessary, they did not split in the manner the dissent suggests—indeed, the dissent's three "approaches" bear no resemblance to the decisions it cites. *See id.* at 45–50. Accordingly, we first correct the dissent's misunderstanding of the common law before addressing its remaining arguments.

The dissent incorrectly asserts that multiple states—Kentucky, Kansas, Michigan, New Jersey, and New York—required a termination to bar any future prosecution against the plaintiff for the same crime. *Id.* at 46. Each of these States, like many States that the dissent places in other categories, required only that the *particular* prosecution against a plaintiff formally ended, not that the termination bar all future prosecutions for the same crime. *See Apgar*, 43 N.J.L. at 66 (holding that a termination is sufficient if it requires the prosecutor to "institute proceedings *de novo*" to "proceed further" against the plaintiff); *Marbourg*, 11 Kan. at 562 (holding that a dismissal is sufficient if "the action has not been commenced again"); *Stanton*, 27 Mich. at 540 (explaining that the favorable-termination element requires only that a "particular proceeding . . . come to an end, so that the [plaintiff] can be no further pursued upon it"); *Clark*, 6 Hill at 347 (concluding that the favorable-termination element is satisfied if the prosecution "cannot be revived,

20

and the prosecutor must be put to a new one" to continue); *Yocum*, 40 Ky. at 359 (concluding that an abandonment of the prosecution satisfied the requirement); *see also Westerstorn v. Dunleavy*, 9 Ky. Op. 635, 636 (1877) (stating that a plaintiff needed to establish "at least a discharge from custody" to satisfy the requirement). The treatise that the dissent cites for this proposition accords with these decisions. *See* 2 Charles T. Boone, *Forms of Pleadings Under the Codes* 273 (S.F., Bancroft-Whitney Co. 1886) (explaining that a claim of malicious prosecution accrues when the prosecution terminates "in such a manner that it cannot be revived, and the prosecutor *if he proceeds further will be put to a new one*" (emphasis added)). No disagreement existed at common law about whether a termination needed to bar all future prosecutions.

Nor did *any* State require an acquittal. With the exception of one decision that does not support its argument, the dissent's conclusion otherwise relies entirely on decisions that suggested in passing dicta that a plaintiff needed an acquittal to prevail. *See Wheeler v. Nesbitt*, 65 U.S. 544, 549 (1860) (dicta); *Stone v. Hutchinson*, 4 Haw. 117, 123 (1878) (dicta), *overruled by McCrosson*, 5 Haw. at 392; *Fortman*, 8 Ohio St. at 550 (dicta); *Bacon v. Towne*, 58 Mass. (4 Cush.) 217, 235 (1849) (dicta); *Jones v. Kirksey*, 10 Ala. 839, 840–41 (1846) (dicta); *see also Kirkpatrick v. Kirkpatrick*, 39 Pa. 288, 291 (1861) (syllabus of court reporter) (reporting that the trial judge had stated in dicta that an acquittal was necessary

21

when a prosecution had proceeded to trial). These decisions, which uncritically echoed the conspiracy writ, did not reflect the common law. When actually faced with a dispute over the favorable-termination requirement, every State the dissent cites held that a plaintiff could proceed without an acquittal. *See, e.g.*, *Zebley*, 12 A. at 571–72; *McCrosson*, 5 Haw. at 392–93; *Fortman*, 8 Ohio St. at 550 (allowing a plaintiff to proceed without a jury acquittal in the underlying civil prosecution and concluding that the favorable-termination requirement "is the same" when a claim of malicious prosecution concerns a criminal prosecution); *Long v. Rogers*, 17 Ala. 540, 546–47 (1850); *Sayles*, 45 Mass. at 425–26; *Cotton*, Minor at 203; *see also Stewart v. Sonneborn*, 98 U.S. 187, 195 (1878) (stating in dicta that a plaintiff must allege that "the proceeding . . . has failed"); *Cardival v. Smith*, 109 Mass. 158, 159 (1872) (listing several terminations other than an acquittal that could support a suit for malicious prosecution).

Indeed, other than an abrogated decision from New York, no State required an acquittal. *See M'Cormick v. Sisson*, 7 Cow. 715, 716–17 (N.Y. 1827), *abrogated by Fay*, 36 N.Y. at 13, *Clark*, 6 Hill at 346–47, *and Burhans*, 19 Wend. at 418; *see also Ragsdale v. Bowles*, 16 Ala. 62, 64 (1849) (stating in dicta that the favorable-termination element required a court judgment or a discharge following judicial investigation), *overruled by S. Car & Foundry Co. v. Adams*, 32 So. 503, 506 (Ala. 1902). Even treatises that appeared sympathetic to the acquittal rule,

22

including the treatise the dissent cites, conceded that the favorable-termination requirement encompassed more than acquittals. *See, e.g.*, Cooley, *supra*, at 186 (stating that the termination must "in general" be an acquittal but acknowledging several exceptions); 2 Simon Greenleaf, *A Treatise on the Law of Evidence* § 452, at 414–15 (John Wilder May ed., Bos., Little, Brown & Co. 13th ed. 1876) (adopting a similar conclusion); 1 Morris M. Estee, *Estee's Pleadings, Practice and Forms* § 1791, at 653 (Carter P. Pomeroy ed., S.F., Bancroft-Whitney Co. 3d ed. 1886) ("An action for malicious prosecution can not be maintained until the plaintiff has been acquitted, *or the prosecution is finally terminated in his favor*." (emphasis added)).

Under an accurate understanding of the common law, the dissent is left with three reasons to depart from our position: that some courts opined in dicta that the favorable-termination element required an acquittal, that no court explicitly advanced the standard we endorsed, and that courts disagreed over some aspects of the favorable-termination element. None of these arguments has merit.

Although we agree that dicta can inform whether a well-settled rule of law existed when Congress enacted section 1983, the dicta supporting the acquittal rule does not offer meaningful guidance. To start, one of the states the dissent cites never suggested that an acquittal was an element of malicious prosecution, *see Kirkpatrick*, 39 Pa. at 298–99, and the Kingdom of Hawaiʻi did so only in short-

23

lived dicta after Congress enacted section 1983, *see Stone*, 4 Haw. at 123, *overruled by McCrosson*, 5 Haw. at 392. More importantly, no decision to actually opine that an acquittal was necessary justified its dicta, much less reasoned that an acquittal was necessary because it provided evidence of a plaintiff's innocence. And as discussed, every State to reach the issue, including each State the dissent cites, held that plaintiffs could proceed without an acquittal. *See generally* Bryan A. Garner et al., *The Law of Judicial Precedent* § 4, at 69 (2016) ("Dictum should never be taken as determining an issue of law when it conflicts with a holding on point . . . ."); *id.* § 18, at 176 (explaining that the persuasiveness of an ancient decision "depends on the degree to which its underlying principles have been buttressed or weakened by later cases and events"). When weighed against the mountain of caselaw to the contrary, the unreasoned dicta that the dissent marshals does not change our view.

We also see no problem with deriving a common-law principle from multiple bodies of well-established decisions. That common-law courts did not explicitly reject the indication-of-innocence approach hardly indicts our conclusion—courts outside of Rhode Island did not resolve the issue because no defendant asked them to do so, which strongly suggests that the approach was almost entirely unknown when Congress enacted section 1983. And as explained, the principle we discern from the common law—that a formal end to a prosecution

24

in a manner not inconsistent with a plaintiff's innocence is a favorable termination—closely tracks the dominant approaches to the favorable-termination requirement.

Finally, we cannot agree that "there was *no* well-settled principle of law to glean from the time § 1983 was enacted" because States did not agree about every aspect of the favorable-termination requirement. Dissenting Op. at 50. The dissent asks far too much of precedent when determining whether a "well-settled principle" existed at common law. For example, the Supreme Court had no trouble concluding that the probable-cause element of malicious prosecution was well settled at common law, *Nieves*, 139 S. Ct. at 1726, even though States disputed the evidentiary effect that certain favorable terminations had on this element, *see* Newell, *supra*, at 289–303. Similarly, we are satisfied that the principle we discern from the common law reflects an area of consensus between nearly every State, even if some States held that plaintiffs satisfied the favorable-termination requirement in additional circumstances.

In sum, whether a particular termination affirmatively supported a plaintiff's innocence was not material to the favorable-termination element in the vast majority of States. As common-law courts on both sides of the Atlantic stressed, a termination on technical grounds did not cure the harm that malicious prosecution caused. *See, e.g.*, *Stanton*, 27 Mich. at 540 ("The mischief is done by the arrest and

25

disgrace caused by a charge of crime, and by the expense and annoyance attending the proceeding. A discharge without a trial does not destroy the effect of the mischief . . . ."); Wicks v. Fentham (1791) 100 Eng. Rep. 1000, 1000; 4 T.R. 247, 248 ("[A] bad indictment serve[s] all the purposes of malice, by putting the party to expense and exposing him . . . ." (internal quotation marks omitted)). Instead, the favorable-termination requirement prevented plaintiffs from using the tort to collaterally attack ongoing criminal proceedings or unfavorable terminations. *See* Newell, *supra*, at 331. And under prevailing standards, a plaintiff could satisfy the favorable-termination element of malicious prosecution by proving that a court formally ended the prosecution in a manner that was not inconsistent with his innocence.

Because section 1983 is not merely "a federalized amalgamation of pre-existing common-law claims," *Rehberg*, 566 U.S. at 366, we must determine whether this common-law understanding comports with relevant constitutional principles, *Williams*, 965 F.3d at 1159–60. Here, nothing in the Fourth Amendment supports departing from the weight of the common law. A claim of malicious prosecution under the Fourth Amendment is only "shorthand" for a claim of deprivation of liberty pursuant to legal process, so the validity of these claims depends on whether the seizure was justified, not whether the prosecution itself was justified, *see Williams*, 965 F.3d at 1157–59 (internal quotation marks

26

omitted). That question almost always turns on whether the judicial officer who authorized the seizure had sufficient information before him to support the seizure. *See Williams*, 965 F.3d at 1162–65. Conversely, limiting favorable terminations to those that affirmatively support a plaintiff's innocence redirects the focus to whether the entire prosecution was justified. In other words, the "indication-of-innocence" approach to favorable terminations considers the wrong body of information. *Cf. Garmon v. Lumpkin Cnty.*, 878 F.2d 1406, 1409 (11th Cir. 1989) ("A subsequent indictment does not retroactively provide probable cause for an arrest that has already taken place."). The Fourth Amendment does not require plaintiffs to support their innocence with such a narrow, inapposite source of evidence.

Because "the Fourth Amendment protects against 'searches' and 'seizures' (and not 'prosecutions')," *Whiting*, 585 F.3d at 584, the favorable-termination requirement functions as a rule of accrual, not as a criterion for determining whether a constitutional violation occurred. Indeed, we have never considered the requirement outside of the accrual context. *See Uboh*, 141 F.3d at 1006 (holding that the plaintiff's claim was timely because the plaintiff had pleaded that he received a favorable-termination within the statute of limitations); *Whiting*, 85 F.3d at 585–86 (holding that the plaintiff's claim was timely because it accrued when the court dismissed the remaining charges against the plaintiff). In the light of this

27

limited role, the favorable-termination requirement will bar a suit for malicious prosecution only when the prosecution remains ongoing or terminates in a way that precludes any finding that the plaintiff was innocent of the charges that justified his seizure—that is, when the prosecution ends in the plaintiff's conviction on or admission of guilt to each charge that justified his seizure. *See Uboh*, 141 F.3d at 1005 (holding that a plaintiff received a favorable termination even though the plaintiff was convicted on some charges because the prosecutor's dismissal of the other charges was "consistent with . . . a finding of innocence on these specific counts"); *see also Williams*, 965 F.3d at 1165 (holding that a plaintiff "need only prove that probable cause was absent for at least one of the . . . charges that justified his seizure"). In other words, a plaintiff can satisfy the favorable-termination requirement by proving that the prosecution against him formally ended in a manner not inconsistent with his innocence on at least one charge that authorized his confinement.

The officials and dissent contend that our decision in *Uboh v. Reno*, 141 F.3d 1000, forecloses this conclusion, *see* Dissenting Op. at 52–53, but they misread that opinion. To be sure, *Uboh* prevents us from adopting the common-law exception to the favorable-termination requirement for *ex parte* proceedings, *see id.* at 1005–06 (holding that the favorable-termination requirement is an element of claims of malicious prosecution under the Fourth Amendment), which might

28

otherwise apply to warrant hearings, *see Gerstein v. Pugh*, 420 U.S. 103, 120 (1975) (holding that an adversary hearing is not required to justify a pretrial detention). But *Uboh* does not otherwise restrict the favorable-termination element. As part of its survey of approaches to the favorable-termination requirement, *Uboh* explained that other courts had required terminations to provide evidence of the accused's innocence and mentioned in passing dicta that the dismissal before it would meet that standard, but it did not endorse that or any particular approach. 141 F.3d at 1004–05. Indeed, *Uboh* suggested in dicta that a dismissal as untimely would be a favorable termination. *Id.* at 1005.

We acknowledge that our conclusion departs from the consensus of our sister circuits, but we do not agree with the dissent that these decisions should alter our conclusion. To start, the dissent miscounts the circuits that have adopted the indication-of-innocence approach to claims of malicious prosecution under the Fourth Amendment. Although seven circuits have done so, *see Jordan*, 943 F.3d at 545–46; *Lanning*, 908 F.3d at 26; *Donahue*, 280 F.3d at 383; *Salley*, 2020 WL 4664808, at *3–4; *Jones*, 959 F.3d at 763–64; *Awabdy*, 368 F.3d at 1068; *Cordova*, 816 F.3d at 651, the dissent erroneously relies on decisions applying state or local tort law to conclude that the Fifth, Seventh, and District of Columbia Circuits followed suit. *See Lemoine v. Wolfe*, 812 F.3d 477, 479 (5th Cir. 2016) (applying Louisiana tort law); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001)

29

(applying Illinois tort law); *Whelan v. Abell*, 953 F.2d 663, 669 (D.C. Cir. 1992) (applying D.C. tort law). Indeed, the Seventh Circuit has held that a Fourth Amendment claim for unlawful pretrial detention does not require any favorable termination. *See Manuel*, 903 F.3d at 670. More importantly, when considering the decisions of our sister circuits, "[w]e are not merely to count noses. The parties are entitled to our independent judgment." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 785 (7th Cir. 2019) (internal quotation marks omitted). And the justification that our sister circuits offered for the consensus view is unpersuasive.

Each circuit to embrace the indication-of-innocence approach grounded its decision in a comment in the *Restatement (Second) of Torts* or the modern decisions of States that adopted that comment. *See Restatement (Second) of Torts* § 660 cmt. a (Am. L. Inst. 1977) ("Proceedings are 'terminated in favor of the accused' . . . only when their final disposition is such as to indicate the innocence of the accused."); *see also Restatement (First) of Torts* § 660 cmt. a (Am. L. Inst. 1938) (stating the same). It is far from clear that the *Second Restatement* reflects even a modern consensus. *See Restatement (Third) of Torts: Liability for Economic Harm* § 23 cmt. a & n.a (Am. L. Inst. 2020) (acknowledging a split in authority, rejecting the indication-of-innocence requirement, and endorsing a "not-inconsistent-with-innocence" approach). Indeed, two of the three states in this

30

Circuit, including the one in which Laskar's seizure and prosecution occurred, do not require an indication of innocence. *Compare Vadner v. Dickerson*, 441 S.E.2d 527, 528 (Ga. Ct. App. 1994) (holding that a dismissal on jurisdictional grounds is a favorable termination if the prosecutor does not recommence the prosecution), *and Kroger Co. v. Puckett*, 351 So. 2d 582, 585–86 (Ala. Civ. App. 1977) (rejecting the approach in the *Second Restatement* (citing *Adams*, 32 So. 503)), *with Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1356 (Fla. 1994) (requiring a termination "that indicates the innocence of the accused").

Setting this issue aside, modern common law is not the touchstone when defining a claim under section 1983. "[T]he Supreme Court has clarified that the relevant common-law principles are those that were 'well settled at the time of section 1983's enactment.'" *Williams*, 965 F.3d at 1159 (alteration adopted) (quoting *Nieves*, 139 S. Ct. at 1726); *see also Kalina v. Fletcher*, 522 U.S. 118, 123 (1997) (explaining that section 1983 must be "construed in the light of common-law principles that were well settled at the time of its enactment"). Although the *Restatements* and modern treatises often reflect ancient legal principles, the indication-of-innocence approach to favorable terminations has no such pedigree. And we cannot base our decision on common-law doctrines that developed long after Congress enacted section 1983.

31

The dissent next faults us for attempting to "square the tort of malicious prosecution with the Fourth Amendment," Dissenting Op. at 58, and we readily plead guilty to that charge. Although the dissent acknowledges that the Fourth Amendment does not neatly overlap with the tort of malicious prosecution, it nonetheless contends that we must adhere to the common law. *Id.* at 57–59. This argument turns our approach to malicious prosecution on its head. Our oldest decisions on the subject explained that "malicious prosecution" is only a "shorthand way of describing" certain claims for unlawful seizure, not an "independent Fourth Amendment right . . . to be free from a malicious prosecution." *Whiting*, 85 F.3d at 584; *see also Kelly*, 21 F.3d at 1553–55 (reversing a summary judgment against the plaintiff on a claim of malicious prosecution under the Fourth Amendment without considering whether the plaintiff satisfied the common-law elements). More recently, the Supreme Court has explained that "[c]ommon-law principles are meant to guide rather than to control the definition of § 1983 claims" and that we must "closely attend" to the "constitutional right at issue" when defining these claims. *Manuel*, 137 S. Ct. at 921. To give priority to the common law over the Fourth Amendment, we would need to depart from both our earliest decisions on the subject and the decisions of the Supreme Court. Of course, we cannot do so.

32

Finally, the dissent highlights the ostensible policy benefits of the indication-of-innocence approach, such as the "additional opportunity" it could create "for courts to stop false claims" at the pleading stage instead of at summary judgment, Dissenting Op. at 61, but we fail to see how the operation of the Federal Rules of Civil Procedure is relevant to our analysis of the Fourth Amendment. *See Wallace*, 549 U.S. at 390–95 (holding that a Fourth Amendment claim for unlawful seizure without process does not require a favorable termination). We must adhere to the clear commands of the law instead of favoring an alternative policy of judicial economy. *See Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 865 (1986) ("The ordering of competing social policies is a quintessentially legislative function.").

We need not redefine the favorable-termination requirement to provide extra protection for defendants accused of malicious prosecution. The probable-cause requirement already limits meritless claims by placing the burden on the plaintiff to establish "(1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams*, 965 F.3d at 1165. On top of that, the plaintiff must overcome qualified immunity by proving that the absence of probable cause was clearly established. *Id.* at 1168–70. And a plaintiff seized without probable cause must prove he suffered an injury to recover compensatory damages for the specific charges he says were unfounded. *See id.* at 1161–62, 1168.

33

After considering both the common law and Fourth Amendment, we hold that the favorable-termination element of malicious prosecution is not limited to terminations that affirmatively support the plaintiff's innocence. Instead, the favorable-termination element requires only that the criminal proceedings against the plaintiff formally end in a manner not inconsistent with his innocence on at least one charge that authorized his confinement. A formal end to criminal proceedings will satisfy this standard unless it precludes any finding that the plaintiff was innocent of the charges that justified his seizure, which occurs only when the prosecution ends in the plaintiff's conviction on or admission of guilt to each charge that justified his seizure. Because Laskar's complaint alleges that the prosecution against Laskar formally terminated and does not allege that he was convicted or that he admitted his guilt to each charge that justified his seizure, Laskar has alleged that he received a favorable termination.

## B.  Laskar Alleged that Hurd and Jenkins, but Not Allen and Garton, Initiated the Warrant Proceedings Without Probable Cause and with Malice.

The officials contend that Laskar failed to allege that they initiated criminal proceedings against him "with malice and without probable cause" under the common-law elements of our standard. *Paez*, 915 F.3d at 1285 (internal quotation marks omitted). Although some of our precedents were inconsistent on the standards of probable cause and subjective intent that apply to a claim of malicious

34

prosecution, *compare, e.g.*, *Kjellsen*, 517 F.3d at 1238, *and Kingsland*, 382 F.3d at 1234–35 (dicta), *with, e.g.*, *Kelly*, 21 F.3d at 1554–55, we recently reconciled them, *see Williams*, 965 F.3d at 1162–65. Because a claim of malicious prosecution concerns seizures pursuant to legal process, we consider whether the judicial officer who issued the legal process had sufficient truthful information to conclude that probable cause existed. *Id.* at 1162–65. In the context of an arrest warrant, the plaintiff must establish either "that the officer who applied for the warrant should have known that his application failed to establish probable cause" or "that an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Id.* at 1165.

This standard governs whether a defendant initiated criminal process "with malice and without probable cause" under the common-law elements of our standard for malicious prosecution. *Id.* at 1157 (internal quotation marks omitted). Regardless of common-law analogues, a challenge to "pretrial detention unsupported by probable cause . . . lies in the Fourth Amendment." *Manuel*, 137 S. Ct. at 919. And *Williams* clarified the standards for probable cause and subjective intent that the Fourth Amendment requires for the seizures involved in claims of malicious prosecution. *See* 965 F.3d at 1165. Even setting *Williams* aside, adopting multiple standards of probable cause and subjective intent would demand more of

35

plaintiffs than the Constitution requires. We cannot do so. *See Manuel*, 137 S. Ct. at 921 ("Common-law principles are meant to guide rather than to control the definition of § 1983 claims . . . .").

Our standard produces mixed results for Laskar. To establish that the officials initiated criminal proceedings against him without probable cause, he must allege that each official made false statements or omitted information "either intentionally or in reckless disregard for the truth" and that "after deleting the misstatement[s], the [warrant] affidavit is insufficient to establish probable cause." *Williams*, 965 F.3d at 1165 (internal quotation marks omitted). Laskar has met this burden as applied to Hurd and Jenkins, but he has not done so for Allen and Garton. We take each pair of officials in turn.

Laskar easily satisfies his burden to allege that Hurd and Jenkins initiated criminal proceedings against him without probable cause. Laskar's complaint alleges that the affidavit that secured the arrest warrant against him relied entirely on Hurd and the audit report that Hurd and Jenkins produced. The complaint also alleges that the accusations in the affidavit were not only false, but knowingly or recklessly so. For example, the affidavit accused Laskar of using funds from Georgia Tech to pay for fully functional microchips that he then sold to financially benefit Sayana, even though Hurd and his audit team knew that Sayana had never sold microchips and had no evidence that Laskar had ever taken or used

36

microchips. Finally, Laskar does not allege that the warrant contained any true accusations—his complaint mentions only false or materially incomplete allegations. So after excluding the alleged misstatements, we must conclude that the warrant affidavit lacked any factual basis to support probable cause. *See St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) (reiterating that our analysis is "limited to the four corners of the complaint" and that we must draw all reasonable inferences in the plaintiff's favor). "Of course, an affidavit does not support probable cause if it lacks any facts that suggest a crime occurred." *Williams*, 965 F.3d at 1166–67.

Conversely, Laskar has failed to allege that Garton and Allen initiated the warrant proceedings against him without probable cause. Laskar's complaint does not allege that either official intentionally or recklessly made false statements to support the warrant for his seizure. Indeed, his complaint disclaims that possibility. According to the complaint, the warrant affidavit qualified that "[u]nless otherwise indicated, all facts presented herein are derived from [the submitting agent's] conversations and communications with Mr. Hurd." The only other source of information the affidavit cited was Hurd and Jenkins's audit report. Although Laskar's complaint alleges that he later faced a second form of legal process—the indictment four years after his initial seizure—he disclaimed at oral argument that he was seized pursuant to that process. Oral Argument at 12:07–:16 (July 29,

2020). And in any event, Laskar's complaint does not allege that either Allen or Garton made false statements to support the indictment. Without alleging that Allen or Garton intentionally or recklessly made false statements to support the legal process justifying his seizure, Laskar's claims against them fail.

In short, Laskar has alleged that Hurd and Jenkins, but not Allen and Garton, initiated criminal process against him without probable cause and with malice. Because Laskar's claims against Allen and Garton cannot proceed, we do not consider their other arguments. We instead turn to Hurd and Jenkins's remaining arguments for affirmance.

### C. Laskar Alleged that Hurd and Jenkins Caused His Seizure.

Hurd and Jenkins next argue that Laskar has not alleged causation because his indictment was too attenuated from their accusations, but *Williams v. Aguirre* forecloses this argument. In *Williams*, we held that "the relevant injury" for a claim of malicious prosecution under the Fourth Amendment, "is the seizure that followed the arrest warrant, not the broader prosecution." 965 F.3d at 1167. Further, we held that a plaintiff establishes causation if he proves that a defendant's false statements were material to his seizure pursuant to legal process. *Id.* Laskar has satisfied this burden, so he has established causation.

38

*D. Laskar Alleged that Hurd and Jenkins Violated His Clearly Established Right To Not Be Seized Based on Intentional and Material Misstatements in a Warrant Application.*

Because Hurd and Jenkins invoked qualified immunity, Laskar must also establish that they violated a constitutional right of his that was "clearly established" when they caused his seizure. *Kjellsen*, 517 F.3d at 1237 (internal quotation marks omitted). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). "A constitutional right is clearly established only if 'every reasonable official would interpret controlling precedent to establish the particular right the plaintiff seeks to apply' and 'the unlawfulness of the officer's conduct follows immediately from the conclusion that the right was firmly established.'" *Williams*, 965 F.3d at 1168 (alterations adopted) (quoting *Wesby*, 138 S. Ct. at 590).

Laskar has alleged that Jenkins and Hurd violated clearly established law. This Court has long held that officials violate the Fourth Amendment if they knowingly or recklessly make "false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen . . . if such false statements were necessary to the probable cause." *Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999); *see also Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). And

39

if we accept Laskar's allegations as true and draw all reasonable inferences in his favor, Hurd's and Jenkins's liability "follow[s] immediately from the conclusion that [the right] was firmly established." *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted). Laskar alleges that they knowingly or recklessly made the false accusations against him that formed the basis of the warrant affidavit. And because Laskar's complaint does not allege that any statements in the warrant affidavit were both truthful and materially complete, we must assume that the affidavit contained no other facts that could support probable cause. So Hurd's and Jenkins's accusations were also "necessary to the probable cause." *Jones*, 174 F.3d at 1285; *see also Garmon*, 878 F.2d at 1410 (holding that a warrant affidavit that "contained no facts whatever" cannot form a reasonable basis for probable cause). Because Laskar has alleged that Hurd and Jenkins violated his clearly established rights under the Fourth Amendment, they are not entitled to qualified immunity at this stage of the suit.

## IV. CONCLUSION

We **AFFIRM** the dismissal of Laskar's claims against Allen and Garton but **REVERSE** the dismissal of his claims against Hurd and Jenkins, **DENY** as moot his motion to supplement the record with a copy of his arrest warrant, **DENY** as moot the appellees' motion for supplemental briefing, and **REMAND** for further proceedings consistent with this opinion.

40

K. MICHAEL MOORE, Chief District Judge, dissenting:

Today, the majority adopts a legal standard for the favorable termination element of a 42 U.S.C. § 1983 malicious prosecution claim that pushes us out-of-step with our sister circuits and requires the Court to depart from its well-founded opinion in *Uboh v. Reno*, 141 F.3d 1000 (11th Cir. 1998). The majority contends that (1) it is bound to reject the indication of innocence standard by a review of "well-settled" common-law principles at the time of § 1983's passage, and (2) the majority's proposed standard better serves the constitutional concerns implicated by § 1983 and the Fourth Amendment. I dissent because there was no "well-settled" common-law principle as to what was required of a malicious prosecution claimant to meet the favorable termination element in the late 19th century. Further, the rule adopted by majority is an inadequate filter for meritless claims.

## I.    LEGAL FRAMEWORK

The majority correctly relies on *Nieves v. Bartlett* for the proposition that a court must look to common-law principles that were well-settled in 1871 when "defining the contours" of a tort under § 1983. 139 S. Ct. 1715, 1726, 204 L. Ed. 2d 1 (2019). However, a court need not "adopt wholesale the rules that would apply in a suit" in common-law. *Manuel v. Cty. of Joliet*, 137 S. Ct. 911, 920–21, 197 L. Ed. 2d 312 (2017). Rather, after successfully identifying a common-law principle that was well-settled in 1871, a court is tasked with determining "whether that rule is

41

compatible with the constitutional provision at issue." *Williams v. Aguirre*, 965 F.3d 1147, 1159–60 (11th Cir. 2020) (citing *Manuel*, 137 S. Ct. at 921).

The Court applied this framework in *Williams* to determine whether "claims of malicious prosecution are subject to the any-crime rule, which insulates officers from false-arrest claims so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime that the officer thought or said had occurred." *Id.* at 1158. The Court opined that its sister circuits were split on the matter and noted that the Court had not yet resolved the issue as it related to § 1983 malicious prosecution. *Id.* at 1159. Accordingly, the Court traced the history of the probable cause element from English common-law to American courts' and legal scholars' application of the tort in the nineteenth century. *Id.* at 1160–61. In so doing, the Court determined that at the time of § 1983's enactment, there was a well-settled legal principle that a malicious prosecution defendant could not "shield [himself or herself] from liability by establishing probable cause for other charges." *Id.* at 1160 (citations omitted). Then, the Court determined that applying the common-law rule, rather than the any-crime rule, was not prohibited by the constitutional considerations in § 1983. *Id.* at 1161.

## II.    NO WELL-SETTLED COMMON LAW PRINCIPLE

The majority has attempted to re-create the *Williams* analysis in this case. However, the history of the favorable termination requirement is a square peg that

42

does not fit into the round hole that is *Williams.* First, there is no "well-settled" common-law principle as to what a malicious prosecution claimant had to aver to satisfy the favorable termination requirement. While I concede that courts in most states would permit a claim where the plaintiff's prosecution ended in any termination whereby the claimant was either discharged or could not be subject to further prosecution on the same charge, several courts required far more. Thus, while the Court was able to identify a well-settled principle that foreclosed the any-crime rule in *Williams*, no such well-settled principle can be found with respect to the favorable termination requirement. Second, and unlike in Williams, the Court *has already embraced this issue* in *Uboh.* Third, there is no difference in opinion between circuits on whether the favorable termination element requires that the termination indicate the plaintiff's innocence in some way.

As an initial matter, the majority looks to 19th century legal principles to determine whether it was well-settled that a favorable termination requires some indication of innocence. However, *Nieves* does not merely require the Court to compare the modern rule to 19th century jurisprudence to determine whether the two comport. Rather, the pertinent inquiry is whether there was a well-settled principle at the time § 1983 was enacted. Despite this, the majority finds that there is a well-settled principle because most courts did *not* consider innocence while discounting other differences in the jurisprudence. While those courts might not

43

have taken innocence into account, it is not dispositive of the question before the Court.

Based on my own review of 19th century jurisprudence, I find that the majority of cases that embraced the question of what constitutes a favorable termination fall into three categories: (1) those accepting any termination that discharged the plaintiff ("Discharged Cases"); (2) those requiring that the termination be such that the claimant could not be prosecuted further on the same criminal charge ("Jeopardy Cases"); and (3) those requiring a verdict on the merits ("Merits Cases").  Looking to secondary sources from the time period does not square these competing theories; in fact, some acknowledged the lack of cohesion between courts on the issue.  In today's Majority Opinion, the majority performed logical and legal gymnastics to the same set of cases and sources to reach the conclusion that the "vast majority" of courts were in agreement.  Op. at 25.  However, a sterile analysis reveals that no harmony existed between the courts on the issue.

Discharged Cases make up the largest pool, and best support the rule set forth by the majority.  These cases tend to have less analysis to support the proposition that any end short of a guilty plea or verdict is a sufficient end.  *C.f.* II FRANK S. RICE, GENERAL PRINCIPLES OF THE LAW OF EVIDENCE WITH THEIR APPLICATION TO THE TRIAL OF CIVIL ACTIONS AT COMMON LAW, IN EQUITY AND UNDER THE CODES

OF CIVIL PROCEDURE OF THE SEVERAL STATES 1062 (Rochester, The Lawyers' Co-Operative Publishing Co. 1892). Indiana, Oregon, Maine, Tennessee, South Carolina, West Virginia, Connecticut and Iowa applied this straightforward rule. *See Vinal v. Core*, 18 W. Va. 1, 2 (1881) (holding that the termination need not bar any subsequent prosecution for the same alleged crime, but merely that the "particular prosecution was ended"); *Merriman v. Morgan*, 7 Or. 68, 73 (1879) ("[I]t [is] necessary for the appellant to allege that the proceeding against him of which he complained was finally terminated by his discharge or acquittal of the offense charged against him."); *Brown v. Randall*, 36 Conn. 56, 62–63 (1869) (rejecting reasoning that a termination must foreclose subsequent prosecution on the charge, and holding that "when a prosecution has been abandoned, . . . without any arrangement with the accused [or] any request from him that it should be so abandoned," the favorable termination element is met); *Paukett v. Livermore*, 5 Clarke 277, 282 (Iowa 1857) ("It [is] sufficient if [the judge] discharged the accused; and there is nothing demanding that it appear, that he found any precise matter in a certain form."); *Page v. Cushing*, 38 Me. 523, 527 (1854) ("In an action for a malicious criminal prosecution, the plaintiff may show that the prosecution has terminated without proving an acquittal; as that it has been abandoned . . . before his arraignment, or before he has been required to plead."); *Chapman v. Woods*, 6 Blackf. 504, 506 (Ind. 1843) ("If it be shown that the original prosecution, wherever

45

instituted, is at an end, it will be sufficient."); *Thomas v. De Graffenreid*, 11 S.C.L. (2 Nott. & McC.) 143, 145 (S.C. 1819) ("It is not to be understood, that an action, for a malicious prosecution, will not lie unless the party has been acquitted by a jury on trial. On the contrary, a person may have his action . . . if there is a final end of the prosecution and the party discharged.").

Jeopardy Cases differ materially from Discharged Cases. They interpret the favorable termination element to be met wherever "the criminal prosecution is disposed of in such a manner that it cannot be revived." II CHARLES T. BOONE, FORMS OF PLEADINGS UNDER THE CODES WITH FULL REFERENCES TO THE AUTHORITIES 273 (San Francisco, Bancroft-Whitney Co. Law Publishers and Law Booksellers 1886); *see also* MELVILLE M. BIGELOW, ELEMENTS OF THE LAW OF TORTS FOR THE USE OF STUDENTS 76 (3d ed., Boston, Little, Brown, and Company 1878) (noting that for the purposes of malicious prosecution, "[a] dismissal [after the petit jury has been sworn] is a virtual acquittal, since a person cannot be put twice in jeopardy for the same offence"). The caselaw indicates that this was the standard in Kentucky, Kansas, Michigan, New Jersey, and New York. *See Apgar v. Woolston*, 43 N.J.L. 57, 65–66 (N.J. 1881) (noting the "considerable diversity of views with regard to the nature of the decision or determination which shall be considered a final termination of the prosecution," but holding that "the technical prerequisite is only that the particular prosecution be disposed of in such a manner

46

that it cannot be revived"); *Blair v. Meshew*, 7 Ky. Op. 103, 103 (Ky. 1873) ("It must also appear that there has been a final termination of the prosecution against him resulting in his favor, an acquittal or discharge, so that no further prosecution can be had."); *Marbourg v. Smith*, 11 Kan. 554, 562 (1873) ("If the action has been dismissed . . . that is sufficient, if the action has not been commenced again."); *Stanton v. Hart*, 27 Mich. 539, 539–40 (1873) (acknowledging "some conflict in the authorities" but determining that a malicious prosecution claim can be had upon the criminal proceedings having "come to an end, by such an order or discontinuance as will prevent a further prosecution without a new complaint"); *Thomason v. Demotte*, 18 How. Pr. 529 (N.Y. Sup. Ct. 1859) ("[I]t is essential that the complaint should show that the alleged malicious prosecution has been terminated by the plaintiff's acquittal, or in such way that no further proceedings upon it can be had against him.").

The Acquittal Cases require that a plaintiff aver the following to establish a favorable termination:

> [that] the plaintiff has been acquitted . . . . The determination of the prosecuting officer never to bring the indictment to trial, for the reason that he deems the charge entirely unsupported is not sufficient. The plaintiff's acquittal must be alleged. An allegation that he has been discharged is not sufficient. It is not enough to aver that the prosecuting officer declared the complaint frivolous, and refused to try it.

I MORRIS M. POMEROY ESTEE & CARTER P. POMEROY, ESTEE'S PLEADINGS, PRACTICE AND FORMS, ADAPTED TO ACTIONS AND SPECIAL PROCEEDINGS UNDER

47

CODES OF CIVIL PROCEDURE 653 (3d ed., San Francisco, Bancroft-Whitney Co., Law Publishers and Law Booksellers 1886).  A merits acquittal was required in the Kingdom of Hawai'i, Alabama, Pennsylvania, Ohio and Massachusetts, and considered to be the standard by the Supreme Court.  *See Wheeler v. Nesbitt*, 65 U.S. 544, 549 (1860) ("To support an action for malicious prosecution the plaintiff must prove [that the prosecution] finally terminated in his acquittal."); *Stone v. Hutchinson*, 4 Haw. 117, 124 (1878) ("[T]he proposition that it is necessary in an action for malicious prosecution to show that the previous action terminated in an acquittal of the plaintiff, is so well established as not to be open for debate."); *Kirkpatrick v. Kirkpatrick*, 39 Pa. 288, 291, 299 (1861) (affirming the judgment of the trial court declaring nonsuit in a malicious prosecution claim where the plaintiff's conviction was arrested and discharged and finding that "nothing short of an acquittal will answer where the prosecution has progressed to a trial by a petit jury"); *Fortman v. Rottier*, 8 Ohio St. 548, 550 (Ohio 1858) ("In an action for a malicious prosecution . . . upon a criminal charge, it is well settled that the prosecution must be shown to be at an end; and it must also appear that the plaintiff was acquitted of the charge."); *Bacon v. Towne*, 58 Mass. (4 Cush.) 217, 235 (1849) ("It must appear, before this action will lie, that the defendant in the indictment has been fully acquitted."); *Jones v. Kirksey*, 10 Ala. 839, 840–41 (1846) (acknowledging "apparent conflict in the cases" on the issue but opining, "[t]he general rule is, when

48

the action is for a malicious prosecution on account of an alledged [*sic*] criminal offence, that the declaration must show the prosecution is ended and determined by the acquittal and discharge of the party accused").

One state court actually applied a standard almost perfectly analogous to the indication of innocence in the years immediately preceding § 1983's passage. In *Rounds v. Humes*, the Supreme Court of Rhode Island considered a malicious prosecution case where the plaintiff and defendant/prosecutor had met during the pendency of the prosecution and "settled their respective claims." 7 R.I. 535, 537 (1863). The court set forth the rule that a plaintiff must allege "not only that the proceeding complained of is terminated, but the manner in which it has been terminated . . . must be such as to furnish *prima facie* evidence that the action was without foundation." *Id.* (internal citation and quotation marks omitted). Accordingly, the court reversed the verdict in favor of the plaintiff because he "not only failed to prove what was necessary to maintain his declaration, but proved the precise contrary of it." *Id.* at 538.

Ultimately, the practical difference between the approaches presented above is of little importance. I group the cases together in the manner above to illustrate how far apart the competing approaches to the favorable termination requirement were in the late 19th century. To complicate matters further, I highlight both where courts opined that their rule was "well-settled" and where others acknowledged

49

significant disagreement between jurisdictions on the issue. It is clear upon such a review that there was *no* well-settled principle of law to glean from the time § 1983 was enacted.

Even if malicious prosecution claimants who had been discharged but not acquitted could successfully bring their suit in most states in 1871, I would not be convinced that there was a "mountain of caselaw" indicating that the courts were *in accord*. In contrast, the Court encountered a far more consistent body of 19th century law as it applied to probable cause in *Williams*. The pertinent inquiry, both here and in *Williams*, is whether there was a well-settled principle at the time § 1983 was enacted. And, upon determining that there was a principle, a court will determine whether it is appropriate to apply that principle today. In *Williams*, the cases and treatises that the Court reviewed sang in unison: "[A]ccusers could not shield themselves from liability by establishing probable cause for other charges." *Williams*, 965 F.3d at 1160. There was no comparable well-settled principle regarding favorable terminations—which explains why the most esteemed jurists of the day failed to consistently articulate one.

The majority dismisses the Acquittal Cases as having stated such a rule only in dicta. However, identifying "well-settled" principles of law 150 years ago is an exercise that is as academic as it is practical. Dicta from courts of last resort— particularly the Supreme Court—are good indications of whether principles of law

50

were well-settled at the time. Just as treatises of learned scholars from the time period help to inform our understanding of 1871 common-law, dicta by the states' high courts provides much needed context to what the *state of the law* was at the time.

The majority also contends that each Acquittal Case is met with a corresponding case where that state's court "held that a plaintiff could proceed without an acquittal." Op. at 22. However, these cases undermine the majority's argument in that they (1) were written before the corresponding Acquittal Case cited herein—*see Sayles v. Briggs*, 45 Mass. (4 Met.) 421 (1842); *Cotton v. Wilson*, Minor 203 (Ala. 1824)—(2) were issued years after § 1983 was passed—*Zebley v. Storey*, 12 A. 569 (Pa. 1888); *McCrosson v. Cummings*, 5 Haw. 391 (1885)—or (3) simply hold otherwise—*Fortman*, 8 Ohio St. at 550 (differentiating between the requirement that a plaintiff complaining of a malicious *criminal* prosecution must show that he or she was "acquitted of the charge" from the civil prosecution at issue whereby the defendant had "procured an attachment to be issued").

Based on my own review of 19th century precedent, I respectfully disagree that there is a well-settled legal principle that commands that we abandon our reasoning in *Uboh* and defy the sound logic exercised in nearly every other circuit.

Furthermore, the majority advances a standard that does not appear in any 19th century case, has been rejected by several of our sister circuits, and has not been

51

adopted by any other circuit. The majority argues that its proposed standard more accurately reflects the constitutional considerations at issue under the fourth amendment. However, such considerations do not justify adoption of a rule that appears out of thin air. To be clear, the Majority Opinion does not provide the source of its "not inconsistent with his innocence on at least one charge that authorized his confinement" rule. Op. at 28. That is likely because it has not been adopted by any court with persuasive authority before today.

## III.    THE INDICATION OF INNOCENCE IN THE 11TH CIRCUIT

In the absence of a well-settled rule to adopt from 1871, the Court has no reason to stray from its previous application of the indication of innocence standard in *Uboh*. I am not convinced that common-law principles of 1871 or fourth amendment concerns compel a different result.

In *Uboh,* the Court, for the first time, considered whether "a prosecutor's unilateral decision to dismiss specific counts of an indictment" could constitute a termination in favor of a malicious prosecution plaintiff. 141 F.3d at 1004. The Court noted that some courts adhere to the indication of innocence standard. *Id.* In so doing, the Court acknowledged that the following terminations had been held to be insufficient bases for a malicious prosecution charge: a withdrawal of criminal charges pursuant to a compromise or agreement between the prosecutor and the defendant; a dismissal of criminal charges "in the interests of justice"; and a reversal

52

and remand of a criminal conviction. *Id.* at 1004–05. However, the Court noted that other courts had found terminations such as acquittals, dismissals "reflecting an affirmative decision not to prosecute," dismissals pursuant to the expiration of the statute of limitations,[1] *noelle prosequi* dismissals, and grants of writs of habeas corpus to be favorable terminations. *Id.* at 1005 (citing *Hilfirty v. Shipman*, 91 F.3d 573, 584–85 (3d Cir. 1996); *Brandley v. Keeshan*, 64 F.3d 196, 199 (5th Cir. 1995)). Finally, the Court held that, after reviewing the procedural context of the dismissal, that the dismissal was "consistent with (though perhaps not dispositive proof of) a finding of innocence." 141 F.3d at 1005. The decision is narrowly tailored: while it indicated that the facts surrounding that particular dismissal did likely indicate the plaintiff's innocence, it did not decide whether a voluntary dismissal tends to indicate the innocence of the plaintiff. *Id.* at 1004–06; *see also id.* at 1005 n.8 (explaining that the holding was bolstered by "the unique combination of factors present in this particular case"). Thus, while the Court did not formally adopt the indication of innocence test in *Uboh*, it considered other courts' application of the standard and applied it to those specific facts.

---

[1] The Court provided no citation for the proposition that dismissal by way of statute of limitations is a favorable termination.

53

## IV.    THE INDICATION OF INNOCENCE STANDARD'S UBIQUITY

Unlike the any-crime rule in *Williams*, a question that circuit courts were split on, the indication of innocence standard has been adopted by all the circuit courts that have resolved this question.  As such, formal adoption of the indication of innocence standard would synchronize the Court with our sister circuits.

The First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, and D.C. Circuits all rely on the indication of innocence standard, and no federal court of appeals has adopted the majority's rule.  *See Jordan v. Town of Waldoboro*, 943 F.3d 532, 545–46 (1st Cir. 2019) ("[A] plaintiff must show that the prosecution was terminated in such a way as to imply the plaintiff's innocence."); *Lanning v. Cty of Glen Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (declining to apply a "not inconsistent with innocence" test to a § 1983 malicious prosecution claim and clarifying that, per *Manuel*, the court's "prior decisions requiring affirmative indications of innocence" control); *Kossler v.* Crisanti, 564 F.3d 181, 187 (3d Cir. 2009) (requiring a § 1983 malicious prosecution claimant to establish that the termination of the prosecution indicated his innocence); *Salley v. Myers*, — F.3d —, 2020 WL 4664808, at *4 (4th Cir. 2020) (opining that the favorable termination element is satisfied in a § 1983 malicious prosecution claim where the termination indicates the plaintiff's innocence); *Lemoine v. Wolfe*, 812 F.3d 477, 479 (5th Cir. 2016) ("A *nolle prosequi* based on an extradition policy cannot constitute a bona fide termination because such

54

a dismissal is not indicative of innocence."); *Jones v. Clark Cnty*, 959 F.3d 748, 763–65 (6th Cir. 2020) (applying the indication of innocence standard to a § 1983 malicious prosecution claimant); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 924–25 (7th Cir. 2001) (finding that a malicious prosecution claim failed where the plaintiff had not introduced admissible evidence that the dismissal of the charges against him indicated his innocence); *Roberts v. Cty of Fairbanks*, 947 F.3d 1191, 1201–02 (9th Cir. 2020) (acknowledging that the favorable termination element of a malicious prosecution claim—distinct from the favorable termination rule of a challenge to a conviction or sentence—requires a termination that indicates the innocence of the plaintiff); *Cordova v. Cty of Albuquerque*, 816 F.3d 645, 652–53 (10th Cir. 2016) (applying the indication of innocence standard in a § 1983 malicious prosecution case as opposed to a "not inconsistent with innocence" standard, opining that the latter approach "flips the traditional rule on its head by presuming terminations are favorable until proven otherwise"); *Whelan v. Abell*, 953 F.2d 663, 669–70 (D.C. Cir. 1992) (applying the indication of innocence standard).

Although the Fifth, Seventh, and D.C. Circuits have only applied the indication of innocence standard to state-law malicious prosecution claims, they have utilized no alternative standard for the favorable termination element in § 1983 malicious prosecution. Furthermore, those courts' application of the indication of innocence to state-law malicious prosecution is (1) indicative of the confines of a §

55

1983 claim in that jurisdiction, and (2) further evidence of the indication of innocence standard's pervasiveness throughout the federal court system. *Cf. Washington v. Summerville*, 127 F.3d 552, 557–59 (7th Cir. 1997) (ruling that the plaintiff failed to allege that his termination indicated his innocence pursuant to Illinois law, and finding that his § 1983 malicious prosecution claim likewise failed because he could not demonstrate a cognizable state-law claim).

That the indication of innocence standard continues to be used in light of *Manuel* and *Nieves* speaks to its strength. The Second Circuit in *Lanning* opined that the indication of innocence standard prohibits defendants from "relitigat[ing] the issue of probable cause . . . thus posing the prospect of harassment, waste and endless litigation." 908 F.3d at 26 (quoting *Singleton v. Cty of New York*, 632 F.2d 185, 195 (2d Cir. 1980)). Indeed, allowing the favorable termination requirement to retain its teeth sets the tort of § 1983 malicious prosecution apart from § 1983 false arrest; to hold otherwise would reduce the malicious prosecution inquiry to a mere determination of probable cause.

Finally, the Tenth Circuit expressly rejected the not inconsistent with innocence standard. *See Cordova*, 816 F.3d at 654 ("It cannot be the case that all dismissals that result from granted motions are favorable terminations for purposes of malicious prosecution actions."). In so doing, the Tenth Circuit noted that the indication of innocence test is "a standard feature of the tort of malicious prosecution

56

and a reflection of the idea that malicious prosecution actions are disfavored at common law." *Id.* at 653. And, the court emphasized the indication of innocence standard balances the important considerations at play—noting that it may bar some meritorious claims, but it serves as "a useful filtering mechanism, barring actions that have not already demonstrated some likelihood of success." *Id.* at 654. Because almost all courts of appeal have adopted the standard, and our adoption would not only synchronize the circuit courts, but also strike the best balance between filtering out meritless claims and permitting claims that demonstrate some likelihood of success, the Court should adopt the indication of innocence.

## V.   THE TORT OF MALICIOUS PROSECUTION AND THE FOURTH AMENDMENT

The majority argues that the favorable termination requirement functions as a mere "rule of accrual, not as a criterion for determining whether a constitutional violation occurred." Op. at 27. It is not lost on me that the Fourth Amendment is primarily concerned with searches and seizures, not prosecutions. The unlikely interplay between the elements of malicious prosecution and Fourth Amendment considerations has, academically speaking, complicated the administration of the tort under § 1983. For example, then-Circuit Judge Neil Gorsuch concurred in the judgment in *Cordova* but expressed doubts about whether malicious prosecution should remain a recognized tort under § 1983. He opined that because the Fourth Amendment "focused on restraining police action before the invocation of judicial

processes," while the tort of malicious prosecution implicated "the misuse of judicial proceedings, . . . it's just pretty hard to see how you might squeeze anything that looks quite like the common law tort of malicious prosecution into the Fourth Amendment." *Id.* at 662–63 (Gorsuch, J., concurring).  He noted that there was significant diversity between opinions that had embraced the issue, but that the Supreme Court had recently agreed to revisit the question—it had just granted cert in *Manuel v. City of Joliet*, 590 F. App'x 641 (7th Cir. 2015), *cert. granted*, 136 S. Ct. 890, 193 L. Ed. 2d 783 (2016).  However, the Supreme Court declined to take up that mantel.  *See Manuel*, 137 S. Ct. at 923 (Alito, J., dissenting) (opining that the majority ignored "the question that we agreed to decide, *i.e.*, whether a claim of malicious prosecution may be brought under the Fourth Amendment").  The Supreme Court has not since given any indication that malicious prosecution cannot exist as a tort under the fourth amendment, and our own precedent reinforces its continued existence as such.  *See Williams*, 965 F.3d at 1157 (requiring that a § 1983 malicious prosecution claimant satisfy "the elements of the common law tort of malicious prosecution").

The majority attempts to massage the favorable termination requirement in a way that will square the tort of malicious prosecution with the Fourth Amendment, thus tying a tidy bow on the debate.  However, this Court is not tasked with answering this bigger question, left unanswered by the Supreme Court.  Instead, we

58

are asked merely to apply the tort of malicious prosecution under § 1983—a tort which exists, despite some persuasive arguments in favor of its elimination—to a set of facts that might be new to this Court but are far from groundbreaking. If malicious prosecution is a tort that is so incongruous with the Fourth Amendment that it can no longer be cognizable under § 1983, then a court will be asked to prohibit such claims. No one has asked the Court to do so today. Therefore, rather than trying to force § 1983 malicious prosecution to be something completely other than what it is—a tort that concerns the abuse of legal processes—we should apply the law as it lays before us.

## VI. THE MAJORITY'S APPROACH SPRINGBOARDS EVERY CLAIM TO SUMMARY JUDGMENT

The majority does not adequately consider the practical effect of adopting its proposed rule. Even if such a shift will not result in an influx of malicious prosecution cases filed on federal dockets, district courts will face greater difficulty in efficiently disposing with unsupported claims.

The utility of the rule as laid out by our sister circuits and applied in *Uboh* is that it permits courts to dismiss faulty claims *prior to discovery*. For a malicious prosecution claim to survive a motion to dismiss, a plaintiff in any other circuit must *affirmatively aver* that the way the prosecution was terminated indicates his or her innocence in some way. Under the majority's rule, a prospective plaintiff need only

59

plead two negatives: (1) that there was *no* probable cause; and (2) that the termination of the prosecution was *not inconsistent* with his innocence.

This distinction is not semantic. Pleading a want of probable cause is easy. Even in cases where there is ample probable cause for the initiation of legal process, a complaint that reads "Plaintiff was not doing what the arresting officer said Plaintiff was doing" will not be dismissed as a matter of law. Indeed, the district courts within this circuit are routinely forced to deny motions to dismiss on probable cause grounds, even where no evidence would support the plaintiff's allegation. *See, e.g.*, *Blackshear v. Cty of Miami Beach*, 799 F. Supp. 2d 1338, 1347 (S.D. Fla. 2011) ("[W]here the legitimacy of relevant evidence is disputed . . . the question of whether there is an absence of probable cause is inappropriate at [the motion to dismiss] stage in the litigation."); *Ruch v. McKenzie*, No. 1:15-cr-03296, 2019 WL 1407012, at *11 (N.D. Ga. Mar. 28, 2019) (noting that while the court previously denied a motion to dismiss on probable cause grounds—after accepting the claim that there was no probable cause for the plaintiff's arrest as true—the "undisputed evidence available at summary judgment shows [the] [d]efendant had probable cause or at least arguable probable cause to arrest—a fundamentally different factual predicate than existed at the motion to dismiss stage"); *Stefani v. Cty of Grovetown*, No. 1:15-cv-164, 2016 WL 4611575, at *5 (S.D. Ga. Sept. 2, 2016) (determining that "the

60

motion-to-dismiss stage is not the appropriate time" to resolve whether the defendants had arguable probable cause for the purposes of qualified-immunity).

The favorable termination element provides an additional opportunity for courts to stop false claims short. To reduce this element to any termination that is not inconsistent with the plaintiff's innocence on at least one charge, district courts will invariably be bound to deny motions to dismiss on facts that have no chance of surviving summary judgment. Although the Majority Opinion does not explain what a sufficient claim for a favorable termination would look like under its rule, it appears that there is no need for a plaintiff to plead anything more than "the charges against me were dismissed."

The indication of innocence standard does not *per se* disallow a plaintiff like *Laskar* from making a malicious prosecution claim under § 1983. Rather, it merely requires a plaintiff like *Laskar* to point to something that would indicate that *his* dismissal by way of the expiration of the statute of limitations affirmatively indicates his innocence in some way. This is not an onerous task—all that is required is the pleading of some contextual facts. Take, for example, a prosecutor that acted with malice in pursuing a prosecution not founded on probable cause, but then allowed the action to lay dormant until it became time-barred to foreclose a malicious prosecution claim. Such a plaintiff could plead *exactly that* and, depending on the specificity and sufficiency of his allegations, still pass the indication of innocence

test.  *See Cordova*, 816 F.3d at 654.  District courts could dispose of claims where a plaintiff cannot, in good faith, make such averments before discovery commences. And, those plaintiffs that do have meritorious claims could plead the contextual facts necessary to allege that their terminations were favorable.  Not only would government and judicial resources be spared, but plaintiffs that have suffered a genuine malicious prosecution would have no trouble having their cases heard.  The indication of innocence standard is efficient and just.

## VII.  CONCLUSION

Accordingly, because the indication of innocence standard (1) has already been applied by this Court, (2) is heralded as the standard in almost every other circuit, (3) permits the dismissal of spurious claims at the motion to dismiss stage, and (4) is not contrary to any well-settled common-law principle at the time of § 1983's passage, I respectfully dissent.