[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11738

_____

GERMAINE SMART,

Plaintiff-Appellant,

*versus*

COII RONALD ENGLAND,
GARY MALONE,
LARRY BAKER,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:19-cv-00471-MHH-JHE

_____

Before WILLIAM PRYOR, Chief Judge, and ABUDU and ED CARNES, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether prison officials Ronald England, Gary Malone, and Larry Baker enjoy qualified immunity from prisoner Germaine Smart's complaint of retaliation for exercising his right, under the First Amendment, to report official misconduct. Smart alleged that England sexually assaulted him during a pat-down search. After a prison investigator determined that Smart's allegations of sexual assault were unfounded, England charged Smart with the disciplinary infraction of "Lying." A disciplinary tribunal later found that Smart's allegations were false and sanctioned him for lying. The district court granted summary judgment for the officials based on qualified immunity. Because the officials did not violate Smart's First Amendment right, we affirm.

## I. BACKGROUND

In September 2016, Captain Gary Malone of the Alabama Department of Corrections ordered five prison officers, including Sergeant Ronald England, to search Germaine Smart's cellblock. England approached Smart's prison cell, ordered him to strip down to his boxer shorts, and instructed him to stick his arms out of the cell door tray hole so that Smart could be handcuffed for a "shakedown." Smart exited his cell in only boxer shorts. Within view of two other prison officers and two prisoners in adjacent cells,

England conducted a pat-down search of Smart's "waist band, groin and buttock area." A pat-down search, under prison operating procedures, requires "pressing one's hands against and over the . . . clothed body" of the individual being searched. None of the witnesses observed—and Smart himself does not allege—that England removed Smart's boxer shorts or touched Smart's unclothed groin during the pat-down. England found no contraband and returned Smart to his cell without further incident.

Smart filed an administrative complaint of misconduct a few days later. The complaint alleged that, during the pat-down, England "began to fondle Smart[']s penis and scrotum," at which point Smart interjected, "What the f--k are you doing grabbing my d--k and nuts . . . I'm not gay!" England allegedly "snickered with a smile showing gratifying sexual desire."

The prison conducted an administrative investigation in response to Smart's complaint. The Investigations and Intelligence Division assigned George Bynum to investigate. Bynum interviewed seven witnesses: Smart, England, two other prisoners, and three other prison officers. During his interview, Smart reiterated his written account that England had "fondle[d]" his penis. Both prisoners corroborated Smart's complaint. Smart's cellblock neighbor recounted that during the search, Sergeant England had "pulled on inmate Smart's private part twice." And the prisoner who occupied the cell across from Smart recounted that Sergeant England had "massaged inmate Smart[']s] penis." The prison officers, in contrast, denied seeing any misconduct. The two closest

officers, who were about three and eight feet away respectively, reported that England had "conducted a pat-search[]"and had "checked [Smart's] waist band and groin area."

In his investigative report, Bynum found that England "properly patted down inmate Smart" and "follow[ed the prison's] Standard Operating Procedure" for "performing a pat-down search." The standardized report form provides only four options for case dispositions: "Substantiated," "Unsubstantiated," "Unfounded," and "Cleared by Arrest." Bynum marked the case disposition "Unfounded," which is the option that most strongly corresponds to falsity—it means the allegation "was investigated and determined not to have occurred." Ala. Dep't of Corr. Admin. Reg. 454, § III(A)(2). Bynum's supervisors approved his report a week later.

England initiated disciplinary proceedings against Smart. Two days after the approval of Bynum's report, England served Smart with a preliminary disciplinary report charging him with "Lying," a medium-level disciplinary infraction. The Department regulations define "Lying" as "[g]iving false testimony or making a false charge to an employee with the intent to deceive the employee or to prejudice another person." Ala. Dep't of Corr. Admin. Reg. 403, Rule 512. The regulations also prohibit "issu[ing]" a disciplinary report for lying based "solely" on an "unfounded" sexual assault accusation:

> Disciplinary action may be taken when an investigation by the IPCM and/or I&I Investigator determines

that an inmate made a false report of sexual abuse or sexual harassment.

However, an inmate reporting sexual abuse or sexual harassment, shall not be issued a disciplinary report for lying based solely on the fact that their allegations were unfounded or that the inmate later decides to withdraw his / her allegation.

Ala. Dep't of Corr. Admin. Reg. 454, § V(H)(2)(b), (c). After being served with the report, Smart refused to sign it and denied guilt.

To adjudicate whether Smart had committed the infraction of "Lying," the prison held a disciplinary hearing. Lieutenant Larry Baker oversaw that hearing. Smart was given the opportunity to submit pre-hearing questions to three individuals that Bynum had interviewed: two prisoners and a prison officer. Smart also called those individuals to testify at the hearing. One prisoner testified that he "saw [Sergeant] England grab inmate Smart['s] penis," and the other testified that "England reach[ed] around and grabbed inmate Smart['s] penis." The prison officer testified that, during the pat-down, he "heard inmate Smart make the allegation that [Sergeant] England grabbed his penis." England testified that he denied the allegation.

At the close of the disciplinary hearing, Baker found Smart guilty of "Lying." As the basis for his finding, Baker stated that he "believe[d] the sworn testimony" of England that he "conducted a pat search" of Smart, and "accept[ed] the finding of I & I investigator Bynum" that Smart's allegations were unfounded. Baker

recommended the loss of privileges for 30 days and disciplinary segregation for 21 days, and Malone approved the sanctions.

Smart filed suit *pro se*. He alleged that prison officials England, Baker, and Malone "retaliated against [him] for reporting the incident of sexual assault" in violation of the First Amendment. *See* 42 U.S.C. § 1983. Smart demanded injunctive relief and $100,000 in damages. In lieu of discovery, a magistrate judge ordered the officials to file a special report with the sworn testimony of all knowledgeable individuals, which would be treated as a motion for summary judgment. All three officials invoked qualified immunity.

Smart opposed the motion and argued that England's "unlawful issuance" of the disciplinary report was "motivated by his desire to discredit Plaintiff['s] 'protected speech'" and to "whitewash Defendant England['s] abussive [sic], and shameful homosexual act." Smart asserted that the prison regulations gave England and Baker "no leeway or authority" to issue the disciplinary report.

The magistrate judge recommended granting the officials' motion for summary judgment. He found that qualified immunity barred Smart's complaint because no clearly established law prohibited the officials from disciplining Smart. The district court adopted the magistrate judge's recommendation and granted summary judgment for the officials. It found that no clearly established law put the officials on notice that violating Department Regulation 454 could be unconstitutional retaliatory conduct.

## II. STANDARD OF REVIEW

We review *de novo* a summary judgment based on qualified immunity. *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## III. DISCUSSION

State officials enjoy qualified immunity from complaints for damages under section 1983 when they act within their discretionary authority and do not violate any clearly established federal right. *See Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020). An official "bears the initial burden to prove that he acted within his discretionary authority." *Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017). Officials who satisfy that burden are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Laskar*, 972 F.3d at 1284 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)) (internal quotation marks omitted).

Smart makes two arguments for reversal. He argues that the officials lacked the discretionary authority to violate prison administrative regulations. He also argues that the officials violated his clearly established right, under the First Amendment, to be free from retaliation after filing a complaint of sexual assault. We reject both of Smart's arguments in turn.

*A. The Officials Acted Within Their Discretionary Authority.*

To be eligible for qualified immunity, an official must prove that he was performing a "discretionary function" when he engaged in the alleged conduct. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). The official acts within his discretionary authority when he "perform[s] a legitimate job-related function . . . through means that were within his power to utilize." *Id.* at 1265. We examine a job-related function at "a general level rather than in [a] specific application," while taking care not to assess the function at "such a high level of abstraction" that "it becomes impossible to determine whether the employee was truly acting within the proper scope of his job-related activities." *Id.* at 1266–67.

The officials exercised discretionary authority. We have repeatedly explained that the "administration of discipline" is a job-function defined at the appropriate level of generality for the analysis of a public official's discretionary authority. *Id.* (citation and internal quotation marks removed) (explaining that disciplining a student was a "legitimate prerogative[]" of a teacher's job); *see also Harbert Int'l Inc. v. James*, 157 F.3d 1271, 1282–83 (11th Cir. 1998) (concluding that public officials' "discretionary duties included the administration of discipline"); *Sims v. Metro. Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992) (same). Prison officials' duties include disciplining prisoners for behavioral infractions. *See* Ala. Code § 14-1-4(a) (providing that the Department shall determine the

"qualifications, duties, and authority" of prison officials); Ala. Dep't of Corr. Admin. Reg. 403 (defining the infractions, including "Lying," for which officials may administer discipline). So the officials performed a legitimate, job-related function when they disciplined Smart for violating a prison rule prohibiting lying.

Our dissenting colleague asserts that the officials exceeded their discretionary authority by violating Regulation 454 and by conducting an "unlawful hearing" to adjudicate whether Smart lied. Dissent at 15. But our colleague misreads Regulation 454. *See* Ala. Dep't of Corr. Admin. Reg. 454. That regulation does not altogether prohibit prison officials from disciplining a prisoner after a false sexual assault allegation. Indeed, section V(H)(2)(b) of the regulation *expressly* allows such disciplinary actions. *Id.* § V(H)(2)(b) ("Disciplinary action may be taken when an investigation by the . . . [Investigations and Intelligence] Investigator determines that an inmate made a false report of sexual abuse or sexual harassment.").

Regulation 454 instead provides heightened procedural protections for prisoners who have made sexual assault allegations: section V(H)(2)(c) provides that a prisoner cannot be "*issued* a disciplinary report for lying" based "*solely* on the fact that their allegations were unfounded." *Id.* § V(H)(2)(c) (emphasis added). The phrase "issued a disciplinary report" is best read to mean the final *imposition of sanctions*, not the *serving of charges* on a prisoner. The overall report—i.e., the portions incorporating the officer's factual findings, determination of guilt, and recommended sanctions—is

labeled the "Disciplinary Report." The charging form comprises only the first page of the disciplinary report. And the report refers to the delivery of notice of a disciplinary charge to a prisoner as "serv[ing]," not "issu[ing]," the report. In other words, section V(H)(2)(c) requires *final sanctions* to be based on more than "solely" on an investigative finding. Prison officers owe a prisoner process and the consideration of more evidence than a singular investigator's report, before sanctioning him for lying about sexual assault.

Regulation 454 does not forbid officers from *initiating* the disciplinary process, "serv[ing]" a prisoner with charges, or holding a disciplinary hearing. To read the regulation otherwise would eliminate section V(H)(2)(b)'s express provision for disciplinary actions against prisoners who make false allegations. *Id.* § V(H)(2)(c). Regulation 454 could not forbid officers from conducting a hearing after an investigative determination of "unfounded," because *every* such disciplinary action would follow an "unfounded" determination—the investigative report form provides "unfounded" as the option most evidencing falsity, and there is no option for "false." So the officials did not violate Regulation 454 by charging Smart.

Nor did the officers issue Smart a disciplinary report based "solely" on Bynum's investigative finding that Smart's allegations were "unfounded." Instead, the officers held a full disciplinary hearing to adjudicate whether Smart had lied: Smart and England testified before a hearing officer who had the opportunity to assess their credibility; Smart submitted written questions to three additional witnesses; and those witnesses testified by at the hearing and had

their statements incorporated into the disciplinary report. As the basis for the guilty determination and sanctions, the hearing officer credited not only Bynum's report, but also "the sworn testimony of [Sergeant] England." So the officers complied with Regulation 454 and acted within the scope of their discretionary authority in disciplining Smart.

### B. The Officials Did Not Violate Smart's First Amendment Right.

Smart contends that the officials retaliated against him in violation of his right to the freedom of speech. For Smart to establish a violation of his constitutional right, he had to prove that he engaged in protected speech, that officials retaliated against him, an adverse effect on his protected speech, and a causal relationship between the retaliation and the adverse effect. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). A prisoner may state a claim under the First Amendment when he alleges that he was "punished for filing a grievance concerning the conditions of his imprisonment." *Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006), *abrogated in part on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). But we have held that a prisoner's violation of a prison regulation is unprotected by the First Amendment. *See O'Bryant v. Finch*, 637 F.3d 1207, 1215 (11th Cir. 2011); *Smith v. Mosley*, 532 F.3d 1270, 1277 (11th Cir. 2008) ("[I]f a prisoner violates a legitimate prison regulation, he is not engaged in protected conduct [under the First Amendment]." (citation and internal quotation marks omitted)).

A prisoner cannot prove a claim of retaliation based on a prison disciplinary charge when "the inmate was found guilty of

the actual behavior underlying that charge." *O'Bryant*, 637 F.3d at 1215. A prison tribunal's finding that a prisoner committed the disciplinary infraction is dispositive, so long as the prisoner was afforded due process and "some evidence in the record" supports the finding of guilt. *Id.* at 1213 (emphasis omitted) (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)). Due process in this context "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* (citation and internal quotation marks omitted). And the "some evidence" standard is satisfied by even a "meager" showing, so long as "the record is not so devoid of evidence" as to render the tribunal's determination "arbitrary." *Hill*, 472 U.S. at 457.

Smart argues that our holding in *O'Bryant* and *Mosley*—that an actual disciplinary violation is unprotected under the First Amendment—does not apply when the officials unlawfully initiated the disciplinary proceedings. According to Smart, England violated Regulation 454 by unlawfully charging Smart with "Lying" after Smart's sexual assault complaint was determined to be unfounded. *See* Ala. Dep't of Corr. Admin. Reg. 454, § V(H)(2)(c). But as we have explained, Smart misreads Regulation 454. The officials complied with prison regulations in issuing Smart's disciplinary report, so there is no reason to depart from our precedents.

*O'Bryant* and *Mosley* control. The officials afforded Smart due process—a tribunal before which he testified and presented evidence—and found him guilty based on "some evidence." *See Hill*, 472 U.S. at 457. So whether Smart "actually committed the charged

infraction" of lying, and whether "the disciplinary report falsely accuses [Smart] are questions of fact that are decided by the disciplinary panel." *O'Bryant*, 637 F.3d at 1215. To conclude otherwise would "render the prison disciplinary system impotent by inviting prisoners to petition the courts for a full retrial each time they are found guilty of an actual disciplinary infraction after having filed a grievance." *Id.* at 1216. And like in *Mosley*, Smart's administrative complaint "included false statements and w[as], thus, unprotected speech." Dissent at 21 (citing *Mosley*, 532 F.3d at 1276). Because a prison tribunal found that Smart committed the actual disciplinary infraction of "Lying" after a hearing, he cannot "state a retaliation claim against the prison employee who reported [his] infraction." *O'Bryant*, 637 F.3d at 1215. The officials enjoy qualified immunity.

We agree with our dissenting colleague that reports of "rampant sexual abuse" and the high incidence of sexual assault allegations against prison officers are deeply troubling. Dissent at 7–13. But we cannot endorse an approach that allows population-level crime statistics to affect the determination of an individual defendant's culpability. A "pattern" of misconduct within a population, *id.* at 11, does not make a particular defendant culpable. That prison officers are reported to commit "physical and sexual violence" at elevated rates, *see id.* at 11, has no bearing on whether England assaulted Smart. Nor can statistical evidence diminish the procedural protections to which England is entitled. Where Smart's allegations against England were found to be untruthful by both a prison investigator and a disciplinary tribunal, Smart does not get a third bite of the apple in the form of this suit for $100,000 in damages.

## IV. CONCLUSION

We **AFFIRM** the judgment for England, Malone, and Baker.

22-11738                ABUDU, J., Dissenting                1

ABUDU, Circuit Judge, Dissenting:

This case presents the issue of whether Germaine Smart, who is incarcerated at the St. Clair Correctional Facility in Alabama, can be charged and punished with "lying" for accusing a prison guard of sexual assault—even though the investigation upon which the charge and punishment were based only determined that Smart's allegations against the guard were "unfounded" as opposed to untruthful. Because the First Amendment, the Prison Rape Elimination Act ("PREA"), and the PREA-based regulations that the Alabama Department of Corrections promulgated clearly establish that prison officials cannot punish an inmate for filing an "unfounded" grievance, the district court erred in granting Defendants Sergeant Ronald England, Captain Gary Malone, and Lieutenant Larry Baker qualified immunity. Therefore, the district court's grant of summary judgment should be reversed, and the case should be remanded for further proceedings.

## I.  SMART'S ALLEGATIONS OF SEXUAL ASSAULT AND DEFENDANTS' RESPONSE

On or around September 6, 2016, Malone ordered England and other guards to search Smart's cell block based on a tip that another inmate might be planning to escape. At approximately 9:00 p.m., England approached Smart's cell to conduct a search. Given the late hour, Smart was lying on his bunk, but he was still fully clothed. England ordered Smart to take off all his clothes except for his underwear and to put his arms out of the tray hole so that England could handcuff him. Smart—in his underwear,

handcuffed, and outside of his cell in view of other inmates and guards—turned around at England's direction so that England could physically search him.  According to Smart, during the search, England began fondling his penis and scrotum.  England never denied that Smart was partially naked and that he touched Smart's genitals.  Smart, who was shocked and offended by England's manner of touching him, yelled out: "What the fuck are you doing grabbing my dick and nuts [?]  I'm not gay!"  Instead of explaining to Smart why the physical search of his penis and scrotum was proper, or expressly denying that he did anything inappropriate, England just snickered and ordered Smart to step aside so he could search his cell.  England left after not finding any contraband in Smart's cell.  While it is undisputed that England touched Smart's genitals and scrotum, a question of fact remains as to whether England's conduct rose to the level of sexual abuse or was in accordance with St. Clair's strip search policy.  Regardless, at this stage of the litigation, we must accept Smart's allegation that England inappropriately touched him in violation of prison policies.

On either September 8 or 9[1], Smart filed a formal grievance against England for sexual abuse and reported the inappropriate conduct to Malone.  In his grievance, Smart identified three witnesses to the abuse who corroborated Smart's account—two individuals who were incarcerated in cells near him and a prison guard

---

[1] Although Smart's pro se Complaint states September 8, 2016, as the date he reported the incident, the investigative report states that Smart reported the incident on September 9, 2016.

22-11738                ABUDU, J., Dissenting                3

who was present during the incident.  Malone reported the incident to the Alabama Department of Corrections ("ADOC") Investigations and Intelligence Division ("I&I"), which is responsible for, among other things, "[e]nsuring that all allegations of sexual abuse and harassment are thoroughly investigated," "[r]eferring violations of law to the district attorney for prosecution," "[r]eporting statistical data for PREA[-]related incidents," and informing the person who reported the assault of the outcome of the investigation.  *See* Ala. Dep't of Corr. Admin. Reg. 454, § IV(C).

The ADOC assigned I&I Investigator George Bynum to the matter.  The record shows that Bynum interviewed Smart, England, and the three other witnesses Smart identified.  When interviewed, Smart reiterated the same facts asserted in his grievance, and England maintained that the pat down was just him "doing his job and not for sexual gratification."  One of the witnesses, Franky Johnson, stated that he was standing at his cell door window during the September 6 search and observed England pull on Smart's "private part[s]" twice.  The second witness, Timothy Gayle, was housed in a cell across from Smart's and said that he saw England reach around Smart and massage Smart's penis.  He also heard Smart yell out in objection.

About two months later, Bynum interviewed Lieutenant Russell Jones who was present as well during the search.  Jones described Smart as "belligerent" and "loud," but eventually compliant.  He acknowledged that England physically touched "Smart's waistband, groin, and buttock area."  Six months after the incident,

Bynum interviewed Smart's third identified witness, Officer Cameron Smith—who was "three to four" feet away from Smart and England, and observed Smart exit the cell only in his boxers. Smith stated England conducted a search of Smart's "person and cell."

On March 6, 2017, Bynum completed his investigative report and found that Smart's grievance against England for sexual assault was "[u]nfounded." He summarily concluded that England "properly patted down inmate Smart over the outside of his boxer shorts, following Standard Operating Procedure #110 for performing a Shakedown/Pat Search or Frisk." Although the form provided a space for further written comments, Bynum did not provide any. For example, Bynum did not write an assessment of why Smart, Johnson, and Gayle lacked credibility; he did not explain why he believed England's version of events; and he did not include any notes remotely suggesting that Smart fabricated a story. Nor did he note that Johnson and Gayle somehow conspired with Smart to make a false claim against England—a risky action to take given the associated punitive consequences of doing so.

Two days after Bynum finalized his report, England charged Smart with "lying" about the sexual abuse allegation by issuing him a document titled "Disciplinary Report." Under a section titled, "Circumstances of Violation," England wrote: "You inmate Germaine Smart B/M 193127 made an allegation against Sergeant Ronald England on 09/09/2016. Further [i]nvestigation by I & I Investigator George Bynum completed . . . on 03/06/2017.

22-11738                    ABUDU, J., Dissenting                    5

Disposition [s]howed this case 'Unfounded and Closed.' Therefore, you are being charged for Lying."

Smart denied England's assertion that he lied about the incident. Baker conducted a hearing on the charge during which Smart again maintained that everything in his grievance was true. In addition to Gayle and Johnson, who submitted both oral and written testimony reiterating that they had seen England "grab" Smart's penis, Smart called Officer Smith as a witness. Officer Smith testified that he heard Smart burst something out about "England grabbing and fondling with [Smart's] penis." England, who requested St. Clair punish Smart by charging him with lying, did not deny Smart's allegation at all. In fact, England's testimony only consisted of three undisputed facts: "On September 9, 2016, I Sergeant Ronald England conducted a pat search of inmate Germaine Smart b/193127 C-5 cell. After the search, inmate Smart alleged that I Sgt. England grabbed his genitals inappropriately. I&I conducted an investigation into the incident and found that the allegations were unfounded." England did not present any other evidence, and he failed to challenge the credibility of Smart's two witnesses who both saw England sexually abusing Smart.

At the conclusion of the hearing, Baker made a single factual finding: "Smart['s] allegation against Sgt. England is unfounded." As opposed to the seven months it took the prison to investigate and resolve Smart's grievance regarding sexual abuse, England's disciplinary action against Smart was received, reviewed, investigated, and resolved within five days of Bynum's report. There is

no indication in the record that Baker ever read Bynum's report, yet Baker credited it and "believe[d]" England's testimony. Malone—who had ordered the search in the first place—adopted Baker's determination that Smart had lied. He placed Smart in disciplinary isolation for twenty-one days, stripped him of access to the canteen and telephone for thirty days, and denied him visitation privileges for thirty days.

Proceeding pro se, Smart filed a sworn, verified complaint on March 21, 2019, alleging that England sexually assaulted him in violation of his Eighth Amendment rights, and that prison officials unlawfully retaliated against him for filing a grievance in violation of his First Amendment rights.[2] Smart subsequently requested, and the court granted, leave to add two additional defendants to his complaint, Malone and Baker. England, Malone, and Baker filed Special Reports that included their sworn statements, which were construed as Defendants' motion for summary judgment. Ultimately, the district court granted Defendants summary judgment, finding that they were entitled to qualified immunity.

---

[2] The magistrate judge ruled that Smart's Eighth Amendment claim was time-barred. Smart did not contest that ruling below and does not raise it on appeal. Therefore, the only issue before us is whether Defendants violated Smart's First Amendment rights by retaliating against him for filing a grievance accusing England of sexual assault.

22-11738               ABUDU, J., Dissenting                    7

## II.  PREA AND ALABAMA'S REGULATIONS

Smart's claim for sexual assault and retaliation echoes that of countless others in the American criminal legal system.  Sexual abuse in prison has long terrorized those under correctional control.  Indeed, it has been called "America's most 'open' secret."  *See* Chandra Bozelko, *Why We Let Prison Rape Go On*, N.Y. TIMES (April 17, 2015), https://perma.cc/DX2S-S7NJ ("According to the Bureau of Justice Statistics, around 80,000 women and men a year are sexually abused in American correctional facilities.  That number is almost certainly subject to underreporting, through shame or a victim's fear of retaliation.").

To tackle the issue of rampant sexual abuse in jails and prisons, Congress enacted PREA in 2003.  *See* 34 U.S.C. §§ 30301–30309.  Congress found that "[m]embers of the public and government officials [were] largely unaware of the epidemic character of prison rape and the day-to-day horror experienced by victimized inmates."  34 U.S.C. § 30301(12).  It also found that, by conservative estimates, "at least 13 percent of the inmates in the United States ha[d] been sexually assaulted in prison," *id.* § 30301(2), and that "[p]rison rape often [went] unreported" with "inmate victims often receiv[ing] inadequate treatment for the severe physical and psychological effects of sexual assault—if they receive[d] treatment at all," *id.* § 30301(6).  At the time it enacted PREA, Congress found that "[t]he total number of inmates who [had] been sexually assaulted in the past 20 years likely exceeds 1,000,000."  *Id.* § 30301(2).  PREA's purpose was to establish a "zero-tolerance standard for the incidence of prison rape" in the United States, *id.* § 30302(1), and "to

develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape," *id*. § 30302(3). Rape, as defined by PREA and relevant here, includes "the sexual fondling of a person forcibly or against that person's will." *Id*. § 30309(9)(A).

To help accomplish the statute's goals, PREA mandated the issuance of national standards, including guidance on how to address sexual acts by prison staff members against people under their correctional control. *See id*. § 30306 (a),(d); 28 C.F.R. §§ 115.5-115.501. Unfortunately, it took the United States Department of Justice ("DOJ") almost ten years to issue those national standards. *See* 28 C.F.R. §§ 115.5-115.501. The standards expound on the definitions of rape in PREA and specifically define terms like "sexual abuse" and "sexual harassment." For example, "sexual abuse," includes "[a]ny [] intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties . . . ." 28 C.F.R. 115.6(5). The standards also identify ways prisons can respond to and investigate allegations of sexual abuse by guards or other inmates against incarcerated individuals, and they also outline procedures prisons must follow to protect individuals from retaliation when reporting abuse. *See generally id*. §§ 115.5-115.501; 28 C.F.R. §§ 115.51(a), 115.67. Despite these guidelines, incidents of sexual abuse in our nation's jails and prisons are likely much higher than what is reported given that less than half of the victims of sexual abuse report the abuse themselves. *See, e.g.,* U.S. DEP'T. OF JUST., BUREAU OF JUST. STAT., *Substantiated Incidents of Sexual Victimization*

22-11738                ABUDU, J., Dissenting                9

*Reported by Adult Correctional Authorities,* 2016-2018 10 (Jan. 2023), https://perma.cc/2MEV-JZW6 (noting that more than half of the incidents of staff-on-inmate sexual violence nationwide were reported by someone other than the victim). The underreporting is likely even more prevalent among men. *See* Colette Marcellin and Evelyn F. McCoy, URB. INST., *Preventing and Addressing Sexual Violence in Correctional Facilities*: *Research on the Prison Rape Elimination Act* 10 (2021), https://perma.cc/9QYZ-L953.

Every single detention facility in the United States is required to comply with these standards; otherwise, they risk losing certain federal funding. *See* 34 U.S.C. § 30306(e)(2). ADOC's Administrative Regulation 454 ("AR 454") represents ADOC's effort to implement, and therefore, advance PREA's goal of ensuring that institutional facilities are free from sexual violence. Its definition of "sexual abuse," like that of the national regulations, covers conduct by a correctional officer and includes "intentional contact, either directly or through the clothing, of or with the genitalia . . . that is unrelated to official duties or where the staff member . . . has the intent to abuse, arouse, or gratify sexual desire." Ala. Dep't of Corr. Admin. Reg. 454, § III(L).

To ensure those who report sexual abuse are not retaliated against, AR 454 § V(H)(2)(c) specifically forbids officials from "issu[ing] a disciplinary report for lying based solely on the fact that" an inmate's sexual abuse "allegations were unfounded." Ala.

10                          Abudu, J., Dissenting                          22-11738

Dep't of Corr. Admin. Reg. 454, § V(H)(2)(c).[3]  Individuals in custody, however, are not given carte blanche to make baseless sexual abuse accusations fueled by some ulterior motive.  Section V(H)(2)(b), therefore, allows a correctional facility to take "disciplinary action" when an "I&I Investigator determines that an inmate made a false report of sexual abuse or harassment."  *Id.* § V(H)(2)(b).

AR 454 has not had its intended effect.  Sexual abuse in prisons and jails remains a persistent problem in Alabama.  For example, in 2014, the DOJ investigated the Julia Tutwiler Prison for Women and found the prison had a "history of unabated staff-on-prisoner sexual abuse and harassment" which was "grossly

---

[3] Notably, § V(H)(2)(c) uses the word "issue" before disciplinary report as opposed to "impose" or "serve."  "[A] regulation should be construed to give effect to the natural and plain meaning of its words."  *Ala. Air Pollution Control Comm'n v. Republic Steel Corp.*, 646 F.2d 210, 213 (5th Cir. 1981).  The word "issue" means "to send out, put into circulation, distribute or publish."  *Griswold v. United States*, 59 F.3d 1571, 1580 (11th Cir. 1995) (citing *The Random House Dictionary of the English Language* 1015 (2d ed. 1987)).  The word "impose"—in the context of a punishment—means "to make, frame, or apply . . . as compulsory, obligatory or enforceable."  Impose, Merriam-Webster's Unabridged Dictionary, https://perma.cc/7P4A-BPAX (last visited February 7, 2024).  While a document such as a disciplinary report may be issued, stating one may be "imposed" does not make much sense.  Section V(H)(2)(c) therefore clearly and accurately states that a disciplinary report shall not be "issued."  It also makes no distinction between a "preliminary" disciplinary report or a "final" one.  If "issuing a disciplinary report" was supposed to mean "issuing a preliminary disciplinary report," the text would say so.  It does not.

underreported," in part, due to "a heightened fear of retaliation[] and an inadequate investigative process." Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., U.S. Dep't of Just., to Robert Bentley, Governor, State of Ala. (Jan. 17, 2014), https://perma.cc/VE3D-Z9LB (noting prison staff have "raped, sodomized, fondled, and exposed themselves to prisoners. They have coerced prisoners to engage in oral sex. Staff engage[d] in voyeurism, forcing women to disrobe and watch[ed] them while they use the shower and use the toilet."). Similarly, in 2020, an Alabama deputy sheriff arrested a woman for a traffic stop and forced her to perform oral sex on him against her will while she was in his custody. Press Release, U.S. DEP'T OF JUST., *Former Alabama Deputy Sheriff Sentenced for Sexually Assaulting a Woman in His Custody* (Aug. 25, 2023), https://perma.cc/65NR-KG88. The deputy was prosecuted in federal court for the sexual assault and sentenced to twelve and a half years in prison. *Id.*

Continued reports of sexual abuse and violence in Alabama required the DOJ to step in and investigate whether the ADOC was protecting its prisoners from physical and sexual violence within its facilities, including St. Clair. U.S. DEP'T OF JUST. CIV. RTS. DIV., Investigation of Alabama's State Prisons for Men, at 1 (Apr. 2, 2019), https://perma.cc/EY9R-TLL3. Its investigation into sexual abuse by corrections officers was ongoing at the time of publication, *id.* at 1 n.2, but the DOJ report documented an overall "pattern of undeterred systemic sexual abuse in Alabama prisons," *id.* at 35. The DOJ also found that the ADOC's investigations into sexual abuse were "incomplete" and "inadequate." *Id.* at 41.

A review of the ADOC's Survey of Sexual Victimization Data corroborates the DOJ's finding.  The ADOC's data reveal that its own investigations almost never sustain complaints of sexual abuse.  For example, in its Survey of Sexual Victimization data for 2015, the ADOC reported substantiating only three out of sixty-three allegations of "staff sexual misconduct"[4] and none of the twenty-four reports of "staff sexual harassment."[5] ADOC, *Survey of Sexual Victimization* 4-5 (2015), https://perma.cc/3EWX-WTGC. Similarly, in 2017, the ADOC reported substantiating *none* out of sixty-eight allegations of "staff sexual misconduct" and *none* of the thirty-five reports of "staff sexual harassment."  ADOC, *Survey of Sexual Victimization* 4-5 (2017), https://perma.cc/GT7L-3RR2. The same pattern continued in the years that followed.  *See, e.g.*, ADOC, *Survey of Sexual Victimization* 4-5 (2018), https://perma.cc/LG9Q-4XW6 (substantiating one out of twenty-three reports of staff sexual misconduct and zero out of seven reports of staff sexual harassment); ADOC, *Survey of Sexual Victimization* 4-5 (2019), https://perma.cc/A25C-5YXW (substantiating one out of sixty-three reports of staff sexual misconduct and zero out of

---

[4] "Staff sexual misconduct" includes "[i]ntentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks that is unrelated to official duties or with the intent to abuse, arouse, or gratify sexual desire" toward an inmate by an employee.  ADOC, *Survey of Sexual Victimization* 4 (2015), https://perma.cc/3EWX-WTGC.

[5] "Staff sexual harassment" includes "[r]epeated verbal statements, comments or gestures of a sexual nature to an inmate by an employee[.]"  *Id.*

thirty-two reports of staff sexual harassment).  It is against this backdrop that Smart filed his grievance.

### III. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, *Christmas v. Harris County*, 51 F.4th 1348, 1353 (11th Cir. 2022), crediting the specific facts pled in Smart's sworn complaint and drawing all reasonable inferences in the light most favorable to him, *Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). "Summary judgment is warranted where the evidence in the record presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (quoting *Caldwell v. Warden*, 748 F.3d 1090, 1098 (11th Cir. 2014) (internal quotation marks omitted).

### IV. DISCUSSION

On appeal, Smart challenges the district court's decision to grant summary judgment in Defendants' favor based on qualified immunity.  First, he argues that Defendants acted outside of their discretionary authority when they issued him a disciplinary report for lying about his alleged sexual assault.  Second, he contends that even if Defendants' conduct involved discretionary functions, they violated his clearly established right to file a grievance free from retaliation.

14                    ABUDU, J., Dissenting                    22-11738

> A.  *Defendants Acted Outside the Scope of Their Discretionary Authority.*

To invoke the defense of qualified of immunity, Defendants initially bear the burden of establishing that they were "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [their] power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

To answer the first part of that test, our precedent requires that we ask, in a more general way, what the job-related function entails. *See, e.g., id.* at 1267 (reasoning that defendant teacher's classroom behavior while disciplining students was part of her discretionary duty even if the challenged behavior might have been unconstitutional); *Sims v. Metro. Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992) (explaining that question of whether defendant county could discipline employees for their off-duty conduct was distinct from whether off-duty conduct for which employee was disciplined was constitutionally protected); *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (distinguishing between the issue of whether state attorney's investigator had discretionary authority to prepare and submit probable cause affidavits and whether actual probable cause existed for the affidavit).

Temporarily setting aside the unconstitutional nature of Defendants' behavior against Smart, disciplining inmates for violating prison regulations is unquestionably part of a correctional officer's job description. Defendants meet the first part of the discretionary

function test because disciplining inmates is something that, *"but for* the alleged constitutional infirmity, would have fallen with[in] [Defendants'] legitimate job description." *See Holloman*, 370 F.3d at 1266.

The problem for England, Malone, and Baker, however, is that a job-related function—in this case, England's disciplinary report, Baker's investigation, and Malone's punishment—cannot be exercised for an illegal purpose or through illegal means. Because AR 454 and PREA's national standards prohibit the very conduct in which Defendants engaged in response to Smart's grievance, Defendants' decision to charge, investigate, and punish Smart was not for a legitimate, lawful reason. Nor was it done through legitimate, lawful means.

AR 454 states that a person who is in custody and has reported sexual abuse *"shall not be issued a disciplinary report for lying based solely on the fact that their allegations were unfounded."* Ala. Dep't of Corr. Admin. Reg. 454, § V(H)(2)(c) (emphasis added). Yet, England issued Smart "a disciplinary report for lying based solely on the fact that [Smart's] allegations were unfounded." *See id.* Any suggestion that a subsequent hearing, where identical evidence from the I&I investigation was introduced, somehow converted Defendants' conduct into lawful behavior is simply not plausible. Issuing an unlawful disciplinary report, which resulted in an unlawful hearing, that concluded with an unlawful punishment were acts outside of England, Malone, and Baker's discretionary authority. *See Holloman*, 370 F.2d at 1283 (ruling teacher acted

16                    ABUDU, J., Dissenting                    22-11738

outside of her discretionary authority when she pursued the job-related goal of "fostering her students' character education" through classroom prayer because prayer was not a means available to teachers to further their pedagogical duties); *see also Spencer v. Benison*, 5 F.4th 1222, 1231 (11th Cir. 2021) (finding that defendant sheriff was acting within "means that were within his power to utilize" when he verbally ordered the plaintiff to remove cones and vehicles, and the plaintiff had not argued verbal orders were beyond his power to use); *Sims*, 972 F.2d at 1236 (noting that defendant employers acted within the scope of their discretionary authority because "[t]here [was] no contention that the three-day suspension imposed upon the plaintiff employee exceeded the scope of the [their] authority to administer disciplinary measures"). For these reasons, England, Malone, and Baker are not entitled to qualified immunity.

> B. *Defendants' Retaliatory Behavior Violated Smart's First Amendment Rights, and His First Amendment Rights Were Clearly Established.*

Because Defendants were not acting within the scope of their discretionary authority, the qualified immunity analysis could end there. However, even assuming Defendants had overcome the discretionary authority bar, their actions against Smart for filing a grievance were still retaliatory in nature, thus violating his First Amendment rights. *See McDonough v. Garcia*, 90 F.4th 1080, 1097 (11th Cir. 2024) (explaining that if an official was acting within his discretionary authority, a plaintiff may still overcome qualified immunity by establishing a violation of a clearly established right). In

22-11738          ABUDU, J., Dissenting                    17

this case, the retaliation was England's disciplinary report, Baker's disciplinary proceedings, and Malone's decision to punish him by placing him in isolation for thirty days and restrict his contact with the outside world. *See Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006), *abrogated in part on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam) (holding that plaintiff's claim "that he was punished for complaining through the established grievance system about his treatment by [a prison guard]" was sufficient to state a First Amendment retaliation claim).

The law is clear that public officials are not entitled to qualified immunity "when they exercise power irresponsibly," even when engaged in a discretionary function. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Defendants, as prison officials, enjoy some discretion when deciding to punish inmates, but that punishment cannot be in response to an incarcerated person complaining about his prison conditions, especially given the heightened protections that PREA and AR 454 guarantee.

### i.  *Defendants' Acts Were Retaliatory in Nature.*

When an incarcerated person files a grievance to complain about the conditions of his confinement, the First Amendment forbids prison officials from punishing that person based solely on that grievance. *Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008) ("We have explained that 'First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment.'" (quoting *Boxer X*, 437 F.3d at

1112)). Moreover, Congress, through PREA's national standards, provided even greater protection for those whose grievances are related to alleged instances of sexual assault. *See* 28 C.F.R. §§ 115.51(a), 115.67.

Smart's First Amendment claim is a retaliation claim premised on Defendants' acts after he accused England of fondling his penis and scrotum in an inappropriate way. For Smart to prevail on this claim, he must satisfy three elements. First, he must show he had a constitutional right to file his grievance. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Second, he must show Defendants' disciplinary report, investigation, and punishment would likely deter "a person of ordinary firmness" from filing future PREA-related grievances. *See id.* at 1251 ("An objective standard for [the 'ordinary firmness' test] provides notice to government officials of when their retaliatory actions violate a plaintiff's First Amendment rights."). Third, he must show Defendants' actions were directly caused or motivated by Smart filing his grievance. *See id.* at 1250. The evidence in the record supports a finding that Smart has satisfied all three prongs.

First, Smart's protected activity was the filing of his grievance which, after a protracted investigation, was determined to be unfounded. *See Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) ("It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement."); *Boxer X*, 437 F.3d at

1112 ("First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment.").

Second, Defendants' response to Smart's grievance was to issue him a disciplinary report, institute disciplinary proceedings to investigate *him* for lying, and then punish him by placing him in disciplinary segregation and stripping away his canteen, visiting, and telephone privileges for thirty days. Smart, and any other person of "ordinary firmness" who is incarcerated and who experienced any form of sexual misconduct, especially by guards, would be dissuaded from filing a similar grievance. *See Mosley*, 532 F.3d at 1275 & n.10, 1277 (finding that the plaintiff demonstrated the second element of a retaliation claim when he was sentenced to, among other things, forty-five days of disciplinary segregation); *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989) (per curiam) (finding retaliation claim where plaintiff alleged he was placed in disciplinary segregation as punishment).

Finally, Smart can satisfy the causation element as well— England charged Smart with lying based on Smart's "unfounded" grievance. The cascading consequences for Smart all derived from him speaking out against sexual assault. *See Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (finding that the record, on summary judgment, supported a causal connection between the plaintiff's grievance and the discipline the correctional officer imposed).

Defendants also argue that *O'Bryant v. Finch*, 637 F.3d 1207 (11th Cir. 2011), forecloses Smart's First Amendment claim because his punishment was based on an actual finding that he violated a prison regulation by lying about the sexual assault. However, *O'Bryant* actually buttresses—rather than undermines—Smart's retaliation claim and strengthens Smart's causation argument.

In *O'Bryant v. Finch*, the incarcerated plaintiff O'Bryant filed a First Amendment retaliation claim under 42 U.S.C. § 1983 against two prison guards who had issued him disciplinary reports after he filed grievances claiming that he received an inadequate consultation regarding prison rules. *Id*. at 1209. Weeks after O'Bryant filed his consultation-related grievances, a guard issued him a disciplinary report for "disrespect" after he called the guard "ignorant" and "fucking retarded." *Id*. at 1210. Three days later, another guard issued O'Bryant a second disciplinary report for "disrespect" when he refused to back away from his cell door as directed during an emergency happening in another cell. *Id*. at 1211. Notably, the actual basis for the two disciplinary reports, other than O'Bryant's allegation that they were a form of retaliation, had nothing to do with the specific subject matter of O'Bryant's grievances. *See id*. at 1210, 1211. The panel affirmed summary judgment in the defendants' favor because there was sufficient evidence to support the disciplinary panel's finding that O'Bryant was disrespectful and failed to obey the guards' commands and, thus, had violated prison regulations. *See id*. at 1215. In reaching this conclusion, the panel held that, "an inmate cannot state a claim of retaliation for a disciplinary

22-11738                ABUDU, J., Dissenting                21

charge involving a prison rule infraction when the inmate was found guilty of the actual behavior underlying that charge." *See id.* at 1215. The panel also affirmed summary judgment because O'Bryant had failed to show "a causal connection between his earlier grievances and the disciplinary harm" he experienced. *Id.*

With respect to the causal connection issue in *O'Bryant*, the panel relied on *Smith v. Mosley* and *Moton v. Cowart*, which both involved inmates who claimed that prison officials had retailed against them for filing grievances. The plaintiff in *Mosley* could not satisfy the causal connection element because the discipline he received was based on comments that he made in a letter to the DOJ that included false statements and were, thus, unprotected speech. 532 F.3d at 1276. In setting forth the defendants' burden of proof as it related to causation, the *Mosley* court held that, "if the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on his motion for summary judgment." *Id.* at 1278 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999)). Because the correctional officers would have proceeded as they did despite the grievances the plaintiff had lodged, the plaintiff could not meet the causational element. *Id.* at 1279. Here, Defendants have not shown, nor could they, that they would have taken the same action against Smart in the absence of his protected activity because the very purpose of the punishment was the protected activity.

In *Moton*, however, we reversed the district court's grant of summary judgment, ruling that there was a genuine issue of

material fact as to the motivation behind the prison's decision to discipline the plaintiff. 631 F.3d at 1342-43. In that case, the prison guard issued two disciplinary reports immediately after receiving Moton's grievance on the grounds that the language in the grievance—which was written in all capital letters—was disrespectful and Moton's statement that he was going to contact his attorney in response to the first grievance was threatening. *Id*. at 1340-41. In finding that no prison rule was violated, this Court specifically held that an inmate's statement that he plans to call his attorney does not constitute a punishable "'spoken threat,'" and that "using large and upper case letters in a grievance," in and of itself, does not violate the prison rule prohibiting disrespect. *Id*. at 1342. Thus, because no prison rule had been violated, Moton had created a question of fact as to whether the disciplinary reports were actually based on the filing of his grievance. *Id*. at 1342-43. Here too, as further explained below, the lack of evidence against Smart demonstrates no prison rule was violated.

*O'Bryant* also emphasized the importance of due process protections for inmates going through a disciplinary hearing process. Specifically, there must be "some evidence in the record" to support the disciplinary panel's findings, i.e. "some basis in fact." *O'Bryant*, 637 F.3d at 1214 (quoting *Superintendent v. Hill*, 472 U.S. 445, 455-57 (1985) (ruling that a record cannot be "so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary")).

In Smart's case, there was *no evidence* to support England's charge and the ultimate finding that Smart lied about England sexually assaulting him; even Defendants' counsel during oral argument admitted that the prison's written findings were "sparse" at best. The only evidence upon which Baker relied in finding that Smart lied was (1) England's sworn testimony and (2) Bynum's conclusion that Smart's grievance was "unfounded." There was absolutely nothing in Bynum's I&I report or Baker's disciplinary report explaining why they did not credit Smart's testimony; why they did not believe the testimony of Franky Johnson or Timothy Gayle, the two inmates who had a direct line of vision to the incident and stated under oath that they saw England grab Smart's penis; or why they did not credit correctional officer Smith who corroborated hearing Smart contemporaneously scream out when England fondled him. While some deference is due to Baker and Bynum, it is very troubling and surprising that neither referenced any evidence supporting Smart's version of events.

Moreover, England conceded that he placed his hands on Smart's penis and scrotum, and the rest of the evidence introduced by Smart at the disciplinary hearing was unchallenged and unimpeached. England never objected to Smith's testimony that Smart yelled out as the search was happening, and he did not present any evidence questioning Johnson and Gayle's line of sight. Thus, while Bynum concluded that England's genital search might not have amounted to sexual assault, there is absolutely nothing in the record to support a finding that Smart lied about it. Because an "unfounded" determination under AR 454 could not serve as the

basis for issuing a disciplinary report against Smart for lying, it definitely could not support a conviction for lying or the punishment that Smart received based on England's accusation.  *See O'Bryant*, 637 F.3d at 1215.

Finally, the *O'Bryant* court's deference to disciplinary findings does not apply here.  *O'Bryant* explained that a court's failure to defer to such findings "would render the prison disciplinary system impotent by inviting prisoners to petition the courts for a full retrial each time they are found guilty of an actual disciplinary infraction after having filed a grievance."  *O'Bryant*, 637 F.3d at 1216 (emphasis omitted).  However, the correctional officers in *O'Bryant* were not prohibited from charging O'Bryant with disrespecting a guard because there was some evidence in the record to support a finding that O'Bryant uttered those disrespectful statements.  Smart's circumstances are profoundly different.  The deference rationale does not apply when the disciplinary process should have never been utilized in the first place.  Indeed, AR 454, § V(H)(2)(c) was specifically promulgated so that officials who flout prison regulations cannot punish or otherwise retaliate against inmates who report sexual abuse, even when those complaints are later determined to be unfounded.  In contravention of AR 454, England's disciplinary report was a direct response to Smart's grievance and there is nothing in the record to suggest that, absent Smart's formal grievance, England would have charged Smart with lying.  *See Mosley*, 532 F.3d at 1278 (emphasizing that the defendant bears the burden of proving "he would have taken the same action in the absence of the protected activity" (quoting *Thaddeus-X*, 175 F.3d at

22-11738               ABUDU, J., Dissenting                25

399)).  The findings from Baker's subsequent disciplinary proceeding—which did not entertain any new evidence—cannot shield Defendants from Smart's retaliation claim.

> ii.  *Smart's First Amendment Right was Clearly Established.*

Under our precedent, a right can be clearly established in one of three ways: "(1) case law with indistinguishable facts, (2) a broad statement of principle within the Constitution, statute, or case law, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (citing *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (internal quotation marks omitted)).  "A right is 'clearly established' if controlling law gave the official 'fair warning' that his conduct violated that right." *Nelson v. Tompkins*, 89 F.4th 1289, 1299 (11th Cir. 2024) (citation and internal quotation marks omitted).

Decades of Eleventh Circuit case law with materially similar facts provided Defendants fair notice that their conduct violated Smart's First Amendment right to be free from retaliation for filing a grievance.  In 1985, we decided *Bridges v. Russell*, 757 F.2d 1155 (11th Cir. 1985).  In *Bridges*, we held as a matter of first impression that the plaintiff, an incarcerated person, had alleged a First Amendment violation by claiming that prison officials transferred him to another institution as punishment after he, among other acts, filed a grievance concerning racial discrimination in work assignments.  757 F.2d at 1156-57.  One year later we decided *Wright*

*v. Newsome*, 795 F.2d 964 (11th Cir. 1986).  In *Newsome*, we held that an incarcerated person had successfully alleged a First Amendment claim when he asserted prison officials retaliated against him by searching his cell and seizing his property for filing administrative grievances.  795 F.2d at 968.  Several years later, in *Wildberger*, this Court—relying on *Bridges* and *Wright*—explained: "It seems clear that if appellant is able to establish that his discipline was the result of his having filed a grievance concerning the conditions of his imprisonment, he will have raised a constitutional issue, under the authority of these cases."  869 F.2d at 1468.

We have continued to decide materially similar cases establishing that Defendants' conduct violated Smart's First Amendment right to be free from retaliation.  *See Mosley*, 532 F.3d at 1276 (explaining that the First Amendment right of freedom of speech to complain about conditions of confinement is well established); *Moton*, 631 F.3d at 1343 ("It is well established that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." (internal quotation marks and citation omitted)).  We have even done so in the context of an inmate reporting sexual abuse by a correctional officer.  In *Boxer X*, for example, an incarcerated individual sued a correctional officer for punishing him after he complained about her forcing him to repeatedly expose himself to her and to perform sexual acts for her gratification.  437 F.3d at 1112.  We reversed the district court's dismissal of the plaintiff's claims because he had stated a claim for retaliation under the First Amendment.  *Id*.  These cases all demonstrate that

the law clearly established the unconstitutionality of Defendants' conduct. Defendants cannot benefit from the shield of qualified immunity by arguing the law was not clearly established.

*Bridges*, *Wright*, and several other cases also establish a broad, clearly established principle that governs the facts of Smart's situation. *See Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir 2012) (explaining that a plaintiff may rely on a "broader, clearly established principle [that] should control the novel facts [of the] situation) (citation and internal quotation marks omitted)). These cases stand for the proposition that officers may not retaliate against inmates for filing grievances about the conditions of their confinement, and this rule applies with "obvious clarity" to the facts of this case. *See id*. at 1205; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (a "constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question").

We have previously invoked this constitutional principle to deny qualified immunity in a wide range of retaliation cases. In *Bennett*, for example, we denied qualified immunity to sheriff's deputies who intimidated, attempted to arrest, and engaged in other acts of harassment against private citizens for supporting a county referendum that proposed diminishing the power of the sheriff's department. 423 F.3d at 1255-56. In rejecting the deputies' qualified immunity defense, we explained that our precedent and Supreme Court precedent has "long held that state officials may not retaliate against private citizens because of the exercise of their

First Amendment rights." *Id.* at 1255. Therefore, this constitutional rule applied with "obvious clarity" to the specific facts of the case and defeated qualified immunity. *Id.* at 1255-56.

This prohibition on retaliation based on protected First Amendment speech and conduct was invoked again in *Bailey v. Wheeler*, 843 F.3d 473 (11th Cir. 2016). In *Bailey v. Wheeler*, Officer Bailey of the Douglasville Police Department filed a written complaint reporting his colleagues and officers in the Douglas County Sheriff's Office for racial profiling and other constitutional violations. 843 F.3d at 477. In response, the Douglasville Police Department fired him. *Id.* at 479. After he appealed his termination, a Major with the Douglas County Sheriff's Office, Tommy Wheeler, put out an alert to law enforcement that permitted "all Douglas County law-enforcement officers a reasonable basis for using force—including deadly force—against Bailey." *Id.* at 482. In rejecting Wheeler's qualified immunity defense, we relied on the "reasoning . . . and the broad principle" articulated in *Bennett*, which put Wheeler on notice that his behavior would violate Bailey's First Amendment rights. *Id.* at 484.

Thus, the general proposition that correctional officers may not retaliate against prisoners for filing grievances has been well established in the Eleventh Circuit starting from 1985. *See Bridges*, 757 F.2d at 1156; *see also Wright*, 795 F.2d at 968 (recognizing that retaliation for filing lawsuits and administrative grievances violates "the inmate's First Amendment rights"). Protection against retaliation for filing a grievance about sexual abuse at the hands of a

correctional officer certainly falls directly within that general proposition and applies with obvious clarity to Smart's case.

PREA, its regulations, and AR 454 reinforce the obviousness of Defendants' First Amendment violation. The PREA regulations, promulgated pursuant to federal statute, specifically provide for protection against retaliation. *See, e.g.*, 28 C.F.R. § 115.67(a) ("The [prison or jail] shall establish a policy to protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff . . . ."); *id.* § 115.67(b) ("The [prison or jail] shall employ multiple protection measures, such as housing changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims, and emotional support services for inmates or staff who fear retaliation for reporting sexual abuse or sexual harassment or for cooperating with investigations.").

If these federal standards were not enough to place Defendants on notice, AR 454 itself prohibits retaliation against inmates for reporting sexual abuse. *See, e.g.*, AR 454 § V(K)(1) ("Retaliation in any form for the reporting of, or cooperation with, sexual abuse or harassment allegations is strictly prohibited."); *id.* § V(K)(2) ("The Warden and [Institutional PREA Compliance Manager] shall ensure inmates and staff who report sexual abuse, sexual harassment, or cooperate with a sexual abuse investigation are protected from retaliation by other inmates or staff."). Although prison regulations themselves do not constitute constitutional law, they

certainly "undermine any claim by defendants that they were unaware of their legal obligations" not to retaliate. *See Al-Amin v. Smith*, 511 F.3d 1317, 1336 n.37 (11th Cir. 2008). Importantly, this is not a case where Smart is arguing there is some obscure, unknown state regulation that prohibits Defendants' conduct. This is a case where there is clear Eleventh Circuit precedent prohibiting retaliation based on filing a grievance, federal regulations that prohibit retaliation based on a report of sexual abuse, *and* a state regulation forbidding the same. Moreover, AR 454 was specifically promulgated to comply with PREA and PREA-based national standards. Given these judicial authorities, statutory authorities, and regulatory authorities, the "salient question," of whether Defendants had fair warning that their conduct was unconstitutional, can only be answered with a resounding "yes." *See Hope*, 536 U.S. at 731 (explaining that in determining whether a right was clearly established, the "salient question . . . is whether the state of the law . . . gave [the officers] fair warning that [their] alleged treatment of [the plaintiff] was unconstitutional.").

## V. CONCLUSION

The power imbalance between incarcerated individuals and correctional officers is clear. Recognizing this very power dynamic, Congress acknowledged that "[p]rison rape often goes unreported," 34 U.S.C. § 30301(6), because of the widespread fear of retaliation. Smart had nothing to gain by lying and everything to lose by reporting England. Despite this risk, which manifested into reality, Smart chose to speak out and was punished for doing so. There can be no clearer, straightforward violation of the First

22-11738                 Abudu, J., Dissenting                 31

Amendment right to file a grievance free from retaliation than this case.

For these reasons, I respectfully dissent.